**UNITED STATES of America, Appellee,**

**v.**

**Alexander BORTNOVSKY, a/k/a "Sasha," and Leonid Braz, Defendants–Appellants.**

**Nos. 650, 651, Dockets 88–1410, 88–1411.**

United States Court of Appeals, Second Circuit.

Argued Jan. 9, 1989.

Decided June 27, 1989.

Elizabeth Glazer, New York City, Asst. U.S. Atty. for the S.D.N.Y. (Benito Romano, U.S. Atty., Kerry Martin Bartlett, Asst. U.S. Atty., of counsel), for appellee.

Julia Pamela Heit, New York City, Heit & Grant, for defendant-appellant, Alexander Bortnovsky.

Michael H. Soroka, Garden City, N.Y., for defendant-appellant, Leonid Braz.

Before VAN GRAAFEILAND and MINER, Circuit Judges, and LASKER, District Judge.*

LASKER, District Judge:

Alexander Bortnovsky and Leonid Braz appeal from their judgments of conviction entered on September 15, 1988 for conspiracy to conduct the affairs of an enterprise through a pattern of racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d) (count one); participation in the affairs of an enterprise through a pattern of racketeering in violation of § 1962(c) of RICO (count two); and mail fraud in violation of 18 U.S.C. § 1341 (count nine). The defendants challenge the conduct of the government during trial, the admissibility of certain evidence, the legal sufficiency of the convictions arising under the mail fraud statute and RICO, and the legality of their sentences. The decision below is affirmed in all respects but one: the case is remanded for the limited purpose of correcting the sentences.

## I. BACKGROUND

In the summer of 1988, defendants Bortnovsky and Braz were tried for conspiracy to participate and actual participation in the affairs of an enterprise through a pattern of racketeering ("the RICO counts") and for a single count of mail fraud.[1] Prior to trial, count three, charging the defendants with conspiracy to defraud the federal government by filing false claims with the Federal Emergency Management Administration ("FEMA"), and counts four through eight, each of which involved an allegation of mail fraud, were dismissed as barred by the statute of limitations. *United States v. Bortnovsky*, 683 F.Supp. 449 (S.D.N.Y. 1988).

---

* Hon. Morris E. Lasker, United States District Court for the Southern District of New York, sitting by designation.

1. This is not the first time that Bortnovsky and Braz were tried on these charges. Their earlier convictions for these three counts, as well as for conspiracy to defraud the United States by filing fraudulent claims with the Federal Emergency Management Administration and five additional mail fraud counts, were reversed because the district court's denial of the defendants' motion for a bill of particulars was held to be an abuse of discretion. *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir.1987) (per curiam). On January 19, 1988, a subsequent indictment was dismissed because the defendants had not been retried in compliance with the 70 day limit set by the Speedy Trial Act.

In connection with their ownership of two clothing stores, Braz and Bortnovsky were alleged to have engaged in a number of schemes to defraud the agencies that insured their businesses; these schemes constituted the RICO predicate acts. In answer to special interrogatories, the jury found both defendants to have participated in the arson of one of their stores on August 25, 1981 (predicate act one) and mail fraud for the subsequent filing with the New York Property Insurance Underwriters Association ("NYPIUA") of a claim for over $100,000 for losses resulting from the fire (predicate act two). In addition, the jury found the government to have proven Braz's participation in yet another predicate act, namely mail fraud for filing a claim with the Federal Crime Insurance Program ("FCIP") for coats alleged to have been stolen during a burglary of one of the stores (predicate act three). Neither Braz nor Bortnovsky were found to have engaged in a scheme to stage burglaries of their stores and thereafter file fictitious claims (predicate act four).

Braz's post-trial motion for a new trial, based on the court's exclusion of a document supporting Braz's contention that he had received the coats whose alleged theft was the basis of his FCIP claim, was denied. Bortnovsky and Braz were respectively sentenced to concurrent terms of six and eight years' imprisonment on all counts; each also was sentenced to two years of probation following release from custody and ordered to pay $5,225 in restitution.

On appeal, the defendants contend that: 1) the government knowingly introduced and relied on perjured testimony, 2) the court improperly excluded from evidence

an exculpatory report,[2] 3) the government's proof was insufficient as a matter of law to establish that the defendants had committed mail fraud, 4) the government failed to prove a pattern of racketeering necessary for the RICO counts, and 5) the sentences were invalid as a matter of law in several respects, some of which the government concedes.

## II. DISCUSSION

### A. GOVERNMENT'S USE OF PERJURED TESTIMONY

At trial, the government elicited the opinion of Fire Marshal George W. Powell that the fire of August 25, 1981, the basis of predicate act one, had been intentionally set. He testified that he reached this conclusion because he smelled gasoline on the clothes of Angel Guzman, who died in the fire and whose remains were found during the excavation. The defendants maintain that this testimony was false, that the government knew it to be such, and that, accordingly, the conviction must be reversed and a new trial granted. They premise their argument that Powell's testimony was "palpably false" on his failure to state in reports of his investigation of the fire or in earlier testimony that he had smelled gasoline on Guzman's clothing. This argument lacks merit.

Powell's earlier silence provides an insufficient basis upon which to find that the later testimony was false. At most, Powell's testimony differed from, but did not contradict, what he said earlier. However, even if this testimony had conflicted directly with that given previously, the difference alone would not constitute perjury. Presentation of a witness who recants or contradicts his prior testimony is not to

be confused with ... perjury. It was for the jury to decide whether or not to credit the witness.

*United States v. Holladay*, 566 F.2d 1018, 1019 (5th Cir.) (per curiam), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978). *See also United States v. Hemmer*, 729 F.2d 10, 17 (1st Cir.) (inconsistencies between witness's statements before grand jury and at trial do not warrant inference that government knowingly used false testimony), *cert. denied*, 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984); *United States ex rel. Burnett v. Illinois*, 619 F.2d 668, 674 (7th Cir.) ("Contradictory testimony does not constitute perjury.") (footnote omitted), *cert. denied*, 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980). Nor does the fact that Powell's testimony conflicted with that of the defendants' expert at an earlier trial support an inference of perjury.[3] *Cf. United States v. Miranne*, 688 F.2d 980, 989 (5th Cir.1982) (differing testimony of two government witnesses presented at most a credibility question for the jury), *cert. denied*, 459 U.S. 1109, 103 S.Ct. 736, 74 L.Ed.2d 959 (1983); *United States v. Brown*, 634 F.2d 819, 827 (5th Cir.1981) (proof that "testimony is challenged by another witness or is inconsistent with prior statements" is insufficient to establish due process violation). Powell's failure to report the smell of gasoline on Guzman's clothing earlier was at most a point for the defense counsel to place before the jury for its resolution.

Moreover, even if Powell's prior silence were to establish that his testimony was perjured, the defendants could not prevail because there is no evidence that the government knew or should have known the testimony to be false.[4] *United States v. Holladay*, 566 F.2d at 1019 (affirming

---

**2.** Only Braz made this argument; Bortnovsky was not alleged to have participated in the scheme to which this was relevant.

**3.** Defendants suggest that Powell's testimony was concocted to contradict that of their expert at the earlier trial, who opined that the fire had a natural cause. At that trial, the government relied on the testimony of one of the defendants' former employees to establish that the fire had been intentionally set.

**4.** The alleged misconduct in this case is not "of [such] an extraordinary" nature within the meaning of *Sanders v. Sullivan*, 863 F.2d 218, 226 (2d Cir.1988), as to compel a finding of a due process violation absent a showing of prosecutorial misconduct. In *Sanders*, a witness for the government had recanted his testimony.

conviction where there was no evidence that prosecution knew or believed testimony to be false); *United States v. Miranne*, 688 F.2d at 989 (reversal not warranted where there was no evidence that government had "actual or constructive knowledge of the alleged perjury").

## B. EXCLUSION OF EXHIBIT G

■ The indictment alleged as the third predicate act that Braz's insurance claim of February, 1980 for the theft of sheepskin coats from the store was fraudulent because the coats were not delivered until September, 1980. In response to evidence introduced by the government in support of its argument, Braz sought to introduce defendant's exhibit G, the report of the insurance adjuster. The report stated in relevant part: "We questioned a Mr. David Belsky of the firm Damer Sheepskin Fashions [the supplier] who advised that the goods were delivered to the assured on January 19, 1980, but to date they had not been paid for by the assured." The district court held that the document was not admissible under either Fed.R.Evid. 803(6) as a business record, Fed.R.Evid. 803(8) as a public record, or Fed.R.Evid. 803(24) or 804(b)(5), which provide generally for admission of documents not covered by other exceptions "but having equivalent circumstantial guarantees of trustworthiness." We conclude that this exclusion was not, as Braz argues, an abuse of discretion.[5] *See United States v. Salvador*, 820 F.2d 558, 561 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 458, 98 L.Ed.2d 398 (1987). Nor was the decision denying Braz's Rule 33 motion—for a new trial based on the document's exclusion or, in the alternative, for a hearing as to its reliability—reversible error.

Although Braz speaks of the entire document, the real issue is the admissibility not of exhibit G itself, but of the statement of Belsky it contains. Therefore, to prevail on his argument, Braz must establish not only that the report falls within an exception to the hearsay rule, but also that Belsky's statement is covered by such an exception. Braz has failed to do the latter.

Although the adjuster's report might otherwise qualify as a business record within the meaning of Rule 803(6), Belsky's statement does not satisfy the rule's requirements because there was no showing that he had a duty to report the information he was quoted as having given. *See United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir.1988) (holding exhibit summarizing surveillance activity was admissible because there was no evidence report "improperly incorporated the statements of third persons under no business duty to report"); *United States v. Snyder*, 787 F.2d 1429, 1434 (10th Cir.) (affirming exclusion of report because it contained statements of those with no business duty to report), *cert. denied*, 479 U.S. 836, 107 S.Ct. 134, 93 L.Ed.2d 78 (1986); *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir.1983) (holding tapes of emergency calls were erroneously admitted because the callers were under no business duty to report); *Clark v. City of Los Angeles*, 650 F.2d 1033, 1037 (9th Cir.1981) (hearsay statements within business records are admissible only if the person providing the information had a "duty of accuracy"), *cert. denied*, 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 443 (1982); *United States v. Yates*, 553 F.2d 518, 521 (6th Cir.1977) (finding part of letter not within business record exception because it contained statement outside the scope of business). *Cf. Johnson v. Lutz*, 253 N.Y. 124, 127–28, 170 N.E. 517 (1930) (police officer's accident report, although prepared in ordinary course of business, was inadmissible because it contained statement of bystander who had no duty to report information).

The admissibility of Belsky's statement within the exception for reports of public agencies or the catch-all exceptions depends on its "trustworthiness." Judge Mukasey did not abuse his discretion when ruling that there was insufficient evidence

---

5. Braz also argues in passing that the exclusion was error because exhibit G was an admission of a party opponent. This argument does not merit discussion, because there is no basis upon which to conclude that Belsky was a party opponent.

of the statement's reliability to provide the requisite circumstantial guarantees of trustworthiness.[6] Not only did Belsky have no duty to report the date on which the goods were delivered, there was no evidence that, as an accountant, he would have had personal knowledge of the date on which the coats were delivered. In addition, the statement was supported only by the testimony of Braz and contradicted by the evidence of the government.

Finally, the post-trial decision denying Braz's motion for a new trial because of the exclusion of the statement or a hearing as to the document's reliability was not reversible error. In support of that motion, Braz submitted the results of a polygraph examination that supported his testimony that the coats were delivered before the robbery. In response the government submitted an affidavit of Belsky dated August 8, 1988 in which he stated that he did not recall making the statement at issue nor did he think it likely that he made such a statement because, as an outside accountant, he "was usually not in a position to know when merchandise was delivered by [the supplier]."

The district court properly held that Belsky's affidavit indicated that the statement in exhibit G lacked the reliability to be admissible as an exception to the hearsay rule, because Belsky did not have personal knowledge of the facts reported. Moreover, Judge Mukasey's ruling that the polygraph results did not raise a question as to the propriety of that determination or necessitate a hearing was proper. This court, although not directly addressing the question, has intimated that the results of polygraph tests are inadmissible. *See Repub-*

lic Nat'l Bank of New York v. Eastern Airlines, 639 F.Supp. 1410, 1419 (S.D.N.Y. 1986) (granting motion for summary judgment where polygraph results were only evidence that might raise genuine issue of material fact because "such results are generally inadmissible in federal court"), aff'd, 815 F.2d 232 (2d Cir.1987); *United States v. Hart,* 344 F.Supp. 522, 524 (E.D. N.Y.1971) (admitting on defendant's behalf polygraph test of government witness taken by government because government initiation of test suggested government thought test reliable and excluding results of polygraph examination initiated by defendant). *See also Brown v. Darcy,* 783 F.2d 1389, 1394–95 & n. 11 (9th Cir.1986) (collecting cases holding that lie detector test results inadmissible); *Barrels of Fun, Inc. v. State Farm Fire & Casualty Co.,* 739 F.2d 1028, 1031 (5th Cir.1984) (same); *Dowd v. Calabrese,* 585 F.Supp. 430, 431 n. 6 (D.D.C.1984) (same).

Finally, the exclusion of Belsky's statement, even if error was harmless. The fraudulent claim for the losses sustained during the burglary underlay only one of the three predicate acts in which the jury found Braz participated.

## C. MAIL FRAUD

The defendants' convictions for mail fraud as well as for participation in a RICO enterprise were premised on a letter of May 23, 1983 to Bortnovsky from Kenneth Sapperstein of Sapperstein, Hochberg & Haberman,[7] the adjusting firm retained by DGSM Clothing, Inc. ("DGSM")[8] to assist in evaluating its claim for damage incurred in the fire of August 25, 1981.[9] In the

---

**6.** *United States v. Southland Corp.,* 760 F.2d 1366, 1375–77 (2d Cir.), *cert. denied,* 474 U.S. 825, 106 S.Ct. 82, 88 L.Ed.2d 67 (1985), cited by the defendants, is not to the contrary. Although the court in that case affirmed the admission of a "cryptic" note made by an unavailable witness, the note in that case, unlike the exhibit at issue in the case at hand, was admitted not for the truth of the matter therein, but only for the state of mind of its author.

**7.** The mailing of this letter is the only act alleged to have occurred within the five year

statute of limitations for participation in a RICO enterprise.

**8.** The defendants were part owners of DGSM Clothing, Inc., which had acquired the defendants' second store.

**9.** This letter was one of five proved at trial as evidence of defendants' scheme to defraud the NYPIUA (predicate act two): three of the four other letters were sent by the adjusting firm hired by NYPIUA to the Sapperstein firm requesting information on the claim, seeking information about the store's inventory, and ad-

letter, Sapperstein advised Bortnovsky that he understood no conclusion had been reached on the fire claim of August 26, 1981 and wrote:

> As a formality I wish to advise you that the insurance policy contract mandates certain necessary steps which must be completed prior to two years from the date of the loss. If these steps and any others your attorney may deem necessary are not taken before this time, you will lose all rights. This refers especially to having your attorney file suit before the two year period.

To establish that this mailing violated 18 U.S.C. § 1341,[10] the mail fraud statute, the government must prove: 1) that the defendants "caused" the mailing, namely that they must have acted "with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended," *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1954), and 2) that the mailing was for the purpose of executing the scheme or, in other words, "incident to an essential part of the scheme," *id.* at 8, 74 S.Ct. at 362.

■ Defendants contend that the government's proof satisfied neither of these elements and that accordingly the convictions for counts two and nine must be reversed.[11] Specifically, defendants contend that they cannot be found to have "caused" the mailing because it was sent by a third party—the agent of the defendants no less—and not foreseeable. More-over, Braz argues that, because he neither initiated nor received any of the correspondence concerning the claim, he cannot be found to have "caused" the mailing. Finally, both defendants contend that the letter was not incident to an essential part of the scheme, because it concerned a civil suit rather than the insurance claim. As discussed below, only the argument as to the foreseeability of the mailing gives us pause; however, even that argument is unpersuasive in light of the expansive reading given § 1341 by the courts.

### 1. Causation

■ First, it is not significant for purposes of the mail fraud statute that a third-party, rather than the defendant, wrote and sent the letter at issue, providing, as we find below was true in this case, the defendants could reasonably have foreseen that the third-party would use the mail in the ordinary course of business as a result of defendants' act. *See United States v. Draiman*, 784 F.2d 248, 251 (7th Cir.1986); *United States v. Contenti*, 735 F.2d 628, 631 (1st Cir.1984); *United States v. Martino*, 648 F.2d 367, 394 (5th Cir.1981), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982); *United States v. Reed*, 639 F.2d 896, 906 (2d Cir.1981); *United States v. Ledesma*, 632 F.2d 670, 676 (7th Cir.), *cert. denied*, 449 U.S. 998, 101 S.Ct. 539, 66 L.Ed.2d 296 (1980); *United States v. Moss*, 591 F.2d 428, 436 (8th Cir.1979). *See also United States v. Fermin Castillo*, 829 F.2d 1194, 1198 (1st Cir.1987) (applying

---

vising it that they would be contacted by an accounting firm; the remaining letter was sent by the Sapperstein firm in response to the request of NYPIUA's adjuster for information.

**10.** Section 1341 provides in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, ... or knowingly causes to be delivered by mail according to the direction thereon ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

**11.** Defendants incorrectly argue that count one must also be reversed if the conviction for mail fraud is reversed. The statute of limitations for conspiracy to participate in a RICO enterprise is measured not from the time of the last predicate act, as is true with allegations of participation in a racketeering enterprise, but from the time "the objectives of the conspiracy have been accomplished or abandoned." *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1642, 1643, 104 L.Ed.2d 158 (1989) (citing *United States v. Persico*, 832 F.2d 705, 713–14 (2d Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988)).

mail fraud standard to wire fraud); *United States v. Muni,* 668 F.2d 87, 89 (2d Cir. 1981) (same).

■ Second, defendants' argument that the May 23rd letter falls outside the reach of the statute because it was mailed by defendants' agent to a defendant is not persuasive. The question is whether the defendant reasonably foresaw that the mails would be used, not by whom or to whom the mailing was made, as is evident by the cases holding that correspondence between many combinations of senders and receivers constitutes mail fraud.[12] For example, the courts have found the following to be within the reach of § 1341: mailings from the victim of the fraud to the defendant, *United States v. Toney,* 598 F.2d 1349, 1355 (5th Cir.1979), *cert. denied,* 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980), from the attorney for the insurance company to the company and its accountant, *United States v. Draiman,* 784 F.2d 248, 253 (7th Cir.1986), from the defendant's insurance agent to an insurance company, *United States v. Moss,* 591 F.2d 428, 436 (8th Cir.1979), and from a merchant defrauded by the defendant's scheme to a company essential to process the transaction, *Schmuck v. United States,* — U.S. —, — – —, 109 S.Ct. 1443, 1444–45, 103 L.Ed.2d 734 (1989);[13] *United States v. Muni,* 668 F.2d 87, 89–90 (2d Cir.1981). To the extent the defendants suggest that a mailing from their agent to a defendant is qualitatively different—because a mailing to oneself should not constitute "a mailing" within the meaning of § 1341—the argument is belied by those cases holding that a mailing from an agent of an insurance company to the company or vice versa constitutes a mailing. *See, e.g., United States v. Waterman,* 704 F.2d 1014, 1018 (8th Cir. 1983); *United States v. Ledesma,* 632 F.2d 670, 676–77 (7th Cir.), *cert. denied,* 449 U.S. 998, 101 S.Ct. 539, 66 L.Ed.2d 296

(1980); *United States v. Calvert,* 523 F.2d 895, 903 (8th Cir.1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976).

■ Third, Braz's conviction for mail fraud is not invalid even though he neither initiated nor received the May 23rd letter nor committed any act related to the scheme after the fire. Braz was alleged and found to have conspired with Bortnovsky to defraud the NYPIUA of over $100,000 through submissions of the claim for fire damage. Accordingly, he can be charged with and convicted for mailings, like the letter of May 23, 1983, that further the scheme, despite his lack of direct involvement.[14] *See United States v. Dick,* 744 F.2d 546, 552 (7th Cir.1984); *United States v. Wormick,* 709 F.2d 454, 461–62 (7th Cir.1983); *United States v. Muni,* 668 F.2d 87, 89 (2d Cir.1981); *United States v. Martino,* 648 F.2d 367, 394 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982); *United States v. Toney,* 598 F.2d 1349, 1355 (5th Cir.1979), *cert. denied,* 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980).

■ Fourth, it is true that the May 23rd letter was sent nearly two years after the insurance claim was filed and eighteen months after the last correspondence between the adjusters. However, this alone does not make the mailing too remote to be reasonably foreseeable. Not only have mailings made after a similar passage of time been held to have been caused by the defendant, *United States v. Elkin,* 731 F.2d 1005, 1008 (2d Cir.), *cert. denied,* 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984), the defendants have cited no cases in which the length of time from the defendant's act to the mailing was considered significant.

The defendants' fifth and final challenge to the finding that they "caused" the May 23rd mailing gives us pause: The defen-

---

**12.** Neither party has cited and we have not found any case involving a mailing from an agent of a defendant to that defendant.

**13.** By affirming the mail fraud conviction, the Court in *Schmuck* implicitly found this mailing to be reasonably foreseeable.

**14.** In light of this holding, it is not necessary to address in the RICO section of this opinion Braz's argument that the statute of limitations bars his RICO convictions because he did not participate in any way in the mailing of the May 23rd letter.

dants argue that the May 23rd letter was not part of the ordinary claims process and thus not "reasonably foreseeable." *United States v. Muni*, 668 F.2d 87, 89–90 (2d Cir.1981) (act is "caused not simply when it was a physical consequence of the person's conduct but when, in addition, the actor either knew the consequence would occur or its occurrence was reasonably foreseeable"). While sympathetic to the argument that there should be a limit to the scope of the mailings that are "reasonably foreseeable," we cannot in light of the facts of this case, in themselves and as compared to those of other cases, find that the letter of May 23rd was not reasonably foreseeable as that phrase has come to be understood.

The courts, when construing the mail fraud statute in the context of schemes to defraud an insurance company, have consistently held that defendants "caused" mailings that are part of the ordinary claims process. *See, e.g., United States v. Castile*, 795 F.2d 1273, 1278 (6th Cir.1986) (finding mailings concerning investigation of claim, insured's interest in the property, and rejecting claim were caused by defendant); *United States v. Draiman*, 784 F.2d 248, 252–53 (7th Cir.1986) (finding foreseeable mailings of proofs of loss to client insurance companies, confirming extension of time to revise proof of loss, setting time for defendant's deposition, and advising that the claim was insufficient); *United States v. Contenti*, 735 F.2d 628, 632 (1st Cir.1984) (finding defendant caused mailing of proof of loss, mailing acknowledging its receipt, and mailing of letters arranging for sworn testimony and transmitting claim); *United States v. Moss*, 591 F.2d 428, 436 (8th Cir.1979) (mailing from insurance agent to company indicating defendant's acceptance of policy was foreseeable because defendant was aware that agent was "seeking insurance from out-of-town insurance companies and that the mails were being used to assist the search").

It is true that, unlike the mailings involved in these cases and the four mailings between the insurance adjusters seeking information relating to the claim that were proven as part of predicate act four, the May 23rd letter does not seek information,

clarification, or testimony necessary for the insurance processing. However, it is not so qualitatively different as not to be reasonably foreseeable as part of the claim processing. First, one could reasonably foresee, upon filing an insurance claim, that an adjuster would periodically, as Sapperstein did in the May 23rd letter, apprise the claimant of the status of the claim and of any further, necessary action. Moreover, it is particularly reasonable to anticipate that such a mailing might result from the claim, where, as was true in this case, the adjuster was paid a percentage of the sum for which the case ultimately settled. In addition, Sapperstein's testimony that he followed normal practice when writing the letter of May 23rd and that he has written several such letters lends some support to the argument that the mailing was reasonably foreseeable.

Finally, the defendants have not argued persuasively that this mailing was less foreseeable than others held to be reasonably foreseeable. In *Draiman*, for example, the court held that the defendant had caused the mailings of his proof of loss by the lawyer for the insurance company to the two client insurance companies and their accountant. Although the defendant in *Draiman* might have foreseen that the attorney would mail his proof of loss, it is unlikely that he anticipated counsel would mail the proof of loss to three individuals, resulting in three counts of mail fraud. Similarly, in this case, while Bortnovsky and Braz may very well not have anticipated that the adjuster would send the particular letter at issue, they undoubtedly could expect that the mails would be used to further and monitor their claim. *Cf. Draiman*, 784 F.2d at 251 ("That Draiman ... [did not] even [know] of the particular mailings does not mean that he has slipped by *Pereira*.").

In reaching this conclusion, we are not unaware of the strong arguments to the contrary, particularly the distinctions that can be made between the letter of May 23rd and others more clearly integral to the claims process. Nonetheless, the element of causation of § 1341 has been so liberally

construed as to suggest that it requires only that the use of the mail itself, rather than a particular mailing, be reasonably foreseeable.[15] For example, when rejecting the defendant's challenge to his mail fraud convictions in *United States v. Bucey,* 691 F.Supp. 1077, 1088–89 (N.D.Ill. 1988), the court stated:

A defendant need not actually intend, agree to or even know of a specific mailing to "cause" mail to be sent as long as he or she "does an act with knowledge that the use of mails will follow in the ordinary course of business, or where such can reasonably be foreseen."

(quoting *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954)). By focusing on the foreseeability of the use of the mails when rejecting the defendant's argument that he did not "cause" the mailings at issue, the court in *United States v. Martino,* 648 F.2d 367 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982), also suggested that the question was not whether the defendant foresaw a particular mailing.

[I]t is well settled that one "causes" the use of the mails when he does some act in which it is reasonably foreseeable that the mails will be used. Because [the defendant] was in the insurance business, it cannot seriously be contended that he was unaware that the mail would probably be used in processing a claim.

*Id.* at 405. *Cf. United States v. Fermin Castillo,* 829 F.2d 1194, 1198 (1st Cir.1987) (stating in challenge to wire fraud conviction that "[a]s long as some use of the instrumentality in the course of the endeavor was reasonably to be anticipated, the causation requirement is met") (citations omitted); *United States v. Carpenter,* 791 F.2d 1024, 1035 (2d Cir.1986) (stating that to establish that defendant "caused" mailing it was sufficient that defendant knew use of mail was reasonably foreseeable consequence of scheme), *aff'd,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *United States v. Ledesma,* 632 F.2d 670, 676–77

(7th Cir.1980) (emphasizing in discussion of cases supporting affirmance of mail fraud conviction foreseeability of use of mail), *cert. denied,* 449 U.S. 998, 101 S.Ct. 539, 66 L.Ed.2d 296 (1980).

Moreover, it is of some significance that Congress has not, in light of the expansive reading of § 1341 by the courts, acted to narrow its scope. In fact, to the extent that Congress has amended the mail fraud statute in the recent past, it has done so to ensure a broader construction than that of the Supreme Court. Section 1346, adopted in 1988, ensures that mail fraud encompasses "scheme[s] ... to deprive another of the intangible right of honest services" and thereby overrules *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), in which the Court held that § 1341 was intended only to prevent schemes to obtain property or services. *See* 134 Cong.Rec. H 11251 (daily ed. Oct. 21, 1988) (statement of Rep. John Conyers). *See also United States v. Berg,* 710 F.Supp. 438 (E.D.N.Y.1989) (recounting history of § 1346).

In sum, in light of the reasonable foreseeability of the letter of May 23rd, the courts' liberal construction of § 1341's causation requirement, and Congress' failure to act in any way other than to expand the scope of the mail fraud statute, we conclude that the defendants "caused" the mailing of the letter of May 23rd.

### 2. Furtherance of the Scheme

■ Despite defendants' argument to the contrary, there is no serious question that the letter of May 23rd was "incident to an essential part of the scheme" to recover from NYPIUA the losses caused by the fire. The letter alerted Bortnovsky that his claim had not yet been settled and of the need to act promptly to preserve his right under the terms of the policy to recover the sum sought through a civil cause of action. It was thus incidental to the scheme to recover the insurance benefit

---

**15.** As was true in *Muni,* 668 F.2d at 90 n. 7, we need not decide whether the question of foreseeability should be so broadly construed.

payments, because it advised the defendants of another route by which they might recover the funds from the NYPIUA, the normal claims processing having proven unsuccessful.

In this respect, the mailing is virtually indistinguishable from one of the mailings found to satisfy § 1341's "in furtherance" requirement in *United States v. Draiman*, 784 F.2d 248, 253 (7th Cir.1986). There the court rejected the defendant's argument that letters from the attorney for the insurance company, stating that the proofs of loss and supporting documentation were insufficient, conflicted with, rather than furthered, the scheme to defraud the insurance company. The court stated, in words fully applicable to the case at hand, that the defendant "was continuing to try to collect, and these letters helped give him another chance." *Id.* Sapperstein's letter similarly gave Braz and Bortnovsky another chance. This letter is not qualitatively different from that of *Draiman* simply because the "other chance" in this case required the defendants to pursue a new avenue of recovery. *Cf. United States v. Lane*, 474 U.S. 438, 452–53, 106 S.Ct. 725, 733–34, 88 L.Ed.2d 814 (1986) (holding mailings concerning partial payments were in furtherance of the scheme because jury could find scheme was "not completed until receipt of the last payment ... which finally settled [the] claim").

Moreover, mailings, such as the letter of May 23rd, sent as part of the business of processing a claim or transaction have generally been held to be "incident to an essential part of the scheme." Most recently, in *Schmuck v. United States*, —— U.S. ——, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), the defendant purchased used cars, rolled back their odometers, and then sold the cars to retail dealers at inflated prices. The Court found that the retailer's mailing of title registration forms was essential to the scheme, because it enabled title to pass and thus sustained the dealer's trust of the defendant necessary for the scheme. *Id.* at ——–——, 109 S.Ct. at 1444–1445. *See also United States v. Contenti*, 735 F.2d 628, 632 (1st Cir.1984) (mailings of notice of loss, acknowledging receipt of loss, and

other mailings part of routine to process claim were in furtherance of scheme to defraud); *United States v. Muni*, 668 F.2d 87, 90 (2d Cir.1981) (interstate communications for credit card authorization numbers were for the purpose of executing a scheme to defraud a bank because the calls were part of the merchant's routine business and the absence of authorization numbers was likely to create suspicion); *United States v. Moss*, 591 F.2d 428, 436–37 (8th Cir.1979) (letter of insurance company confirming approval of defendant's acceptance of policy and agent's mailing of amendment to company were incident to essential part of scheme because they facilitated processing of insurance policy). In the case at hand, it could be expected, as part of the claim process, that Sapperstein would advise his client of the status of his claim. Just as the mailing to obtain title in *Schmuck* furthered the scheme by maintaining the defendant's relationship with the retailer, so the letter of May 23rd furthered the scheme to defraud the NYPIUA by encouraging the defendants to pursue their claim.

The letter of May 23rd is distinguishable from those in *United States v. Dick*, 744 F.2d 546, 552 (7th Cir.1984), which were held to be too remotely connected to the scheme to support the mail fraud conviction. In *Dick*, the defendants conspired to defraud the Small Business Association and two bonding companies for the work of a subcontractor. The court found that the letters to the general contractor describing the subcontractor's progress were not in furtherance of the scheme, because the general contractor presumably did not care who performed the work or at what price. In this case, the defendants cannot be said not to have cared whether the claim was settled or how it might be pursued.

Moreover, it is also distinguishable from the mailing in *United States v. Tackett*, 646 F.2d 1240, 1244 (8th Cir.1981), that was held to be insufficiently related to the scheme alleged to be encompassed by § 1341. In *Tackett*, the court found that the mailing of an agreement by the defendant to a business associate embodying

their agreement to form a partnership to purchase property was not related to the scheme because the defendant received no further payments from the associate nor did he attempt to contact him again. Thus, the court concluded that the defendant's scheme had reached fruition because his failure to act subsequently indicated that he had "finished milking [the associate]." *Id.* In the case at hand, however, after receiving Sapperstein's letter, the defendants filed a civil suit. Accordingly, the reasoning of *Tackett* is inapplicable to this case.

Finally, the letter of May 23rd was not likely to spark or enhance the probability of detection and thus fall outside the scope of § 1341 as was true of the items mailed in *United States v. Maze,* 414 U.S. 395, 403, 94 S.Ct. 645, 650, 38 L.Ed.2d 603 (1974); *United States v. Pietri Giraldi,* 864 F.2d 222, 224–26 (1st Cir.1988); *United States v. Castile,* 795 F.2d 1273, 1278–81 (6th Cir.1986); *United States v. Otto,* 742 F.2d 104, 109 (3d Cir.1984), *cert. denied,* 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985); and *United States v. LaFerriere,* 546 F.2d 182, 187 (5th Cir.1977). Nor was it mailed after the defendants had reaped the fruits of the scheme so that it could no longer further the scheme. *United States v. Maze,* 414 U.S. at 402, 94 S.Ct. at 649; *United States v. Ledesma,* 632 F.2d 670, 677–78 (7th Cir.), *cert. denied,* 449 U.S. 998, 101 S.Ct. 539, 66 L.Ed.2d 296 (1980); *Garrick–Aug Assoc. Store Leasing, Inc. v. Hirschfeld,* 652 F.Supp. 905, 907 (S.D.N.Y. 1986).

### D. RICO

 At the time of argument, the Court of Appeals, sitting en banc, had heard but not yet decided two cases—*Beauford v. Helmsley,* 865 F.2d 1386 (2d Cir.1989) (en banc), and *United States v. Indelicato,* 865

F.2d 1370 (2d Cir.1989) (en banc)—challenging the court's holding in *United States v. Ianniello,* 808 F.2d 184, 191–92 (2d Cir. 1986), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3229, 97 L.Ed.2d 736 (1987), and its progeny that a RICO enterprise could not be established without proof that the enterprise was ongoing and involved more than a single scheme with no demonstrable ending point. *See Beauford v. Helmsley,* 843 F.2d 103, 110 (2d Cir.1988); *Creative Bath Products, Inc. v. Connecticut Gen. Life Ins. Co.,* 837 F.2d 561, 564 (2d Cir.1988); *Albany Ins. Co. v. Esses,* 831 F.2d 41, 44 (2d Cir.1987); *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 51 (2d Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). Relying on that line of cases, the defendants contend that the government had failed to establish such a pattern and that the RICO convictions must, therefore, be reversed.

The argument, although respectable at the time it was made, no longer has force in light of the recent en banc decisions. In *Indelicato,* this court held that continuity and relatedness were, contrary to *Ianniello* and its progeny, "essentially characteristics of activity rather than of enterprise." 865 F.2d at 1382. The court specifically stated that it saw no "basis in RICO or its legislative history for the proposition that a RICO violation cannot be established without proof of more than one scheme, episode, or transaction, or without proof that the scheme pursuant to which the racketeering acts were performed is a scheme with no apparent termination date." *Id.* at 1383. Accordingly, the defendants' RICO convictions stand.[16]

### E. SENTENCING

Bortnovsky and Braz claim that their terms of imprisonment for mail fraud, probation, and restitution do not conform with

---

16. Although this point has not been briefed, there can be little doubt that the pattern of racketeering proven in this case satisfies the standards of *Indelicato.* The court in *Indelicato* emphasized that the pattern of racketeering necessary to sustain a RICO conviction could be established with proof of similarities between the predicate acts, with respect to the victim, methodology or goal, among others, and some threat of continuing activity. 865 F.2d at 1382–83. In the case at hand, each predicate act involved efforts by the defendants to recover on false insurance claims, whether it be for fire or theft, and their repeated activity suggested that the racketeering acts would continue.

the terms of applicable statutes. Braz also contends that the district court abused its discretion when it imposed a longer sentence on him after this trial than after the first.

The government concedes that Bortnovsky and Braz's sentences for mail fraud exceeded the term permitted by law. In addition, the probationary term for both defendants does not conform to 18 U.S.C. § 3651 (repealed effective Nov. 1, 1986), which requires that, where a probationary term follows incarceration, the term of incarceration may not exceed six months. Accordingly, the case is remanded to the district court to correct the terms of the sentences for mail fraud and to review the periods of probation.

■■■ The defendants, each of whom was ordered to pay restitution of $5,225, a sum representing half the amount Braz claimed as losses sustained in the burglary of February 1, 1980, also contend that the sentence of restitution is invalid because the Victim and Witness Protection Act ("the Act") pursuant to which it was imposed, 18 U.S.C. §§ 3663–64, applies only to crimes committed after January 1, 1983. The government answers that, because the defendants' conviction for participation in a RICO enterprise included an act occurring after January 1, 1983, the defendants can be sentenced to pay restitution for any of the acts underlying the RICO conviction. This court has not previously addressed the question and the circuits which have are divided.

At least three circuits have held that restitution may be ordered only for acts committed after January 1, 1983. *United States v. Corn*, 836 F.2d 889, 895–96 (5th Cir.1988); *United States v. Oldaker*, 823 F.2d 778, 781–82 (4th Cir.1987); *United States v. Martin*, 788 F.2d 184, 188–89 (3d Cir.1986). These courts have reasoned that:

> [W]hile a scheme to defraud furthered by separate mailings may properly be viewed as one unitary offense, the losses which resulted therefrom must be separately identified as those which occurred before and those which occurred after

January 1, 1983 for purposes of restitution under the … Act.

*Martin*, 788 F.2d at 189 (footnote omitted). In addition, the fifth circuit concluded that, because the Act increased the possible punishment faced by a defendant by permitting an order of restitution that was not a condition of probation, the Act's application "to acts committed before its effective date raises a problem under the clause of the Constitution forbidding Congress to pass '*ex post facto* Law[s]'." *Corn*, 836 F.2d at 895–96 (footnote omitted).

Three other circuits have reached the opposite conclusion, finding that restitution may be ordered for any act committed as part of a conspiracy if at least one offense occurred after the Act's effective date. *United States v. Angelica*, 859 F.2d 1390, 1392–93 (9th Cir.1988); *United States v. Purther*, 823 F.2d 965, 968 (6th Cir.1987); *United States v. Barnette*, 800 F.2d 1558, 1570–71 (11th Cir.1986) (per curiam), *cert. denied*, 480 U.S. 935, 107 S.Ct. 1578, 94 L.Ed.2d 769 (1987). *Purther* emphasized that the Act refers to the victim of an "offense" and concluded the offense may be a mail fraud scheme, which can include acts committed before January 1, 1983. The court held that the date of the victim's loss was relevant for determining its value, but not as to whether it could be the subject of an order of restitution.

We are persuaded by the decisions in *Angelica*, *Purther*, and *Barnette*. The Act provides for restitution as a part of sentencing for an offense. In this case, the offenses for which the defendants were sentenced include conspiracy to conduct the affairs of an enterprise through a pattern of racketeering and actual participation in a racketeering enterprise. Because the conspiracy and enterprise extended into 1983, any loss sustained as a result of one of the predicate acts underlying the RICO offenses seems to us to fall within the scope of the Act. A contrary ruling would improperly treat the predicate acts, rather than the RICO counts, as the offenses for which the defendants were being sentenced.

The defendants also challenge the order of restitution on the ground that no findings of fact were made at sentencing in support of the award of restitution. Defendants contend that there was no showing that they caused FCIP damage of $10,450: "That Braz may have submitted an invoice to show $10,450 worth of sheepskin coats were in his store on February 1, 1980 does not mean that he claimed all of those goods were stolen." [17] However, we find that the government's proof that the federal government paid the defendants' claim is sufficient proof of the loss. Moreover, as the government notes, there is a serious question whether the defendants, by raising this argument for the first time on appeal, have waived it.

Finally, Braz's argument that the trial court abused its discretion by lengthening his sentence (from that given after the first trial) based on its finding of perjury, but without a hearing, is not persuasive in light of *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978). In *Grayson*, the Court held that a trial judge could include as a factor in sentencing his or her conclusion that a defendant's testimony was perjured. In so holding, the Court rejected an argument, virtually indistinguishable from the one presented by Braz, that consideration of the perjury in sentencing would deprive the defendant of due process, because the enhanced sentence would in effect constitute punishment for perjury without the protection of an indictment, trial, and conviction and would chill the defendant's exercise of his or her right to testify. Moreover, the sentence was reinstated, although the statements of facts in neither the decision of the Supreme Court nor the court of appeals, *United States v. Grayson*, 550 F.2d 103, 107 (3d Cir.1976), indicate that a hearing addressing the finding of perjury was held or required.

We do not agree with Braz's argument that a district court's consideration at sentencing of perjury committed during trial requires the same due process protection as does consideration of a disputed item in a presentence report. A presentence report, unlike evidence introduced at trial, often includes hearsay as to which the defendant may have the right to demand a hearing. *United States v. Romano*, 825 F.2d 725, 728–30 (2d Cir.1987) (holding that defendant must be given an opportunity to dispute accuracy of information contained in a presentence report, but due process does not require that the defendant be allowed to do so at a hearing). However, a sentencing judge's determination that the defendant committed perjury while on the stand is premised on personal observation that satisfies the indicia of reliability required by the Federal Rules of Evidence and that is subject to the court's observation and the defendant's control. Accordingly, we find that the district court did not err in declining to hold an evidentiary hearing concerning its finding that Braz, in testifying, had committed perjury.

\* \* \*

In sum, the case is remanded for the limited purpose of correcting the defendants' sentences for mail fraud and the terms of probation. In all other respects, the decision below is affirmed.

---

**17.** Brief of Defendant–Appellant Leonid Braz at 35 (Nov. 16, 1988).