**EMPIRE BLUE CROSS AND BLUE SHIELD, Plaintiff,**

v.

**Reuven FINKELSTEIN, et al., Defendants.**

**No. CV 91–4816.**

United States District Court, E.D. New York.

June 8, 1995.

Gibson, Dunn & Crutcher by Mitchell A. Karlan, New York City, for plaintiff.

Meissner, Kleinberg & Finkel by Richard A. Finkel, New York City, for defendant Finkelstein.

Coffinas & Coffinas by George G. Coffinas, New York City, for defendant Green.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WEXLER, District Judge.

### FINDINGS OF FACT

1. Empire Blue Cross and Blue Shield ("Empire") brought this action by complaint, dated December 6, 1991, and amended complaint, dated January 17, 1992, for violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c)–(d), and common law claims for fraud, and breach and recision of contract against ten entities (the "defendant groups")[1] and eight individuals (the "individual defendants").[2] Empire proceeded to trial against two of the individual defendants Reuven Finkelstein ("Finkelstein") and Simon Grunbaum a/k/a Simon Green ("Grunbaum") on March 8, 9, and 13, 1995.

2. Empire is a not-for-profit health insurer, providing hospital and medical insurance coverage to approximately 8 million subscribers, most of whom live in New York State. Empire provides what it calls "community-related coverage" for groups consisting of between 3 and 49 employees. Where a group enrolled in community-related coverage consists of between 25 and 49 employees, Empire waives the usual bar against coverage for pre-existing conditions.

3. The defendant groups applied for community-related coverage, which included the waiver of the bar against coverage for pre-existing conditions. As a prerequisite to coverage, Empire asked the defendant groups to each submit two types of documents. The first type, a group administrator application, required the administrator of a group to identify the nature of the group's business, the group's address, a contact person and telephone number, and the group's total number of employees. The group administrator application, executed by the group administrator, obligates the group administrator to provide Empire with the group's employees' applications for coverage and remit to Empire premium payments for that coverage. Empire received group administrator applications for each of the defendant groups beginning in 1984 and continuing thereafter. Finkelstein was listed as the group administrator for Medin; Grunbaum was listed as group administrator for Hospital Software. The second type of document necessary for coverage, individual subscriber applications, identify each subscriber as an "employee" of the group and indicate the nature of his or her job. Empire also received individual subscriber applications for each of the defendant groups.

4. Empire provided the requested coverage to the purported employees of the defendant groups.

---

[1] The defendant groups are KCG Computing, Inc. ("KCG"), G. Contracting, Inc. ("G. Contracting"), Kent Mills, Inc. ("Kent Mills"), East Imports, Inc. ("East Imports"), Avrechai Gur ("Avrechai"), Medin Realty Corporation ("Medin"), Bredis Food Handlers ("Bredis"), Zeigel Manor Realty Sales ("Zeigel"), Mardon Manufacturing ("Mardon"), and Hospital Software. Only one of the defendant groups, Medin, was served with the complaint. Because it failed to respond or appear, the Court, by order dated June 7, 1995, directed the Clerk of the Court to enter default judgment against Medin.

[2] Of the individual defendants, only four were served: Reuven Finkelstein, Simon Grunbaum, Levi Horowitz and Pinchus Horowitz. By stipulation and order, dated November 4, 1994, Empire agreed to voluntarily dismiss Levi and Pinchus Horowitz from the action.

5. In 1987, the New York State Insurance Department (the "Insurance Department") notified Empire that an individual named Eliezer Dvir ("Dvir") had filed with the Insurance Department a consumer complaint (the "Dvir complaint"), which alleged that certain individuals had developed a scheme whereby they would enroll individuals—usually Israelis in need of urgent medical care—for Empire coverage as employees of certain New York companies. The Dvir complaint indicated that Pinchus Horowitz and Finkelstein contacted Dvir in Israel and offered to him the opportunity for coverage in exchange for a fee.

6. Empire undertook an investigation into Dvir's charge in September 1987. It was unable to contact Dvir or Finkelstein. Empire investigated the defendant groups and the subscribers enrolled through the defendant groups in order to ascertain whether they met the criteria for community-related coverage—that is, whether the defendant groups were real businesses and the subscribers actual employees. The investigation uncovered sufficient information for Empire to conclude that the defendant groups were interconnected and involved in a fraud against Empire. Empire then terminated coverage for all individuals enrolled through the defendant groups and brought this action.

7. With respect to the investigation, the Court heard testimony from Patricia Fitzsimons ("Fitzsimons") and Thomas Creelman ("Creelman"), both of whom have been employed by Empire in its Program Security Department during the period of alleged fraud, and from Chaim Rothenberg ("Rothenberg"), Debbie Leibowitz ("Leibowitz"), and George Zeisler ("Zeisler"), each of whom received coverage through one or more of the defendant groups.

8. Fitzsimons testified that it was difficult for Empire to contact the defendant groups because the businesses were not listed in the telephone directories and because the New York State Secretary of State had no records of incorporation for any of the defendant groups except Medin. Creelman testified that he visited and photographed the sites listed as addresses for some of the defendant groups. His testimony and the photographs indicated that most of the sites were residential buildings. For example, when Creelman visited 1916 52d Street, Brooklyn, New York, the address listed for G. Contracting, he found a private home occupied by a woman who indicated that she had resided at that address for at least five years and that she had never heard of G. Contracting.

9. Fitzsimons testified that Empire was also unsuccessful in attempts to contact subscribers because subscribers were either not at the listed addresses or were unwilling to speak to the field investigators. Leibowitz testified that, even though she had enrolled for Empire coverage by listing Kent Mills as her employer, she had never worked for Kent Mills. Zeisler testified that he had never been employed by G. Contracting, but that he had received coverage from Empire after his wife had executed on his behalf an application listing G. Contracting as his employer.

10. Evidence also indicated: that the defendant groups experienced high subscriber turnover rates; that upon enrollment many subscribers immediately used Empire coverage for expensive medical services; and that, in many instances, a subscriber was enrolled for Empire coverage through two or more of the defendant groups at different times. Rothenberg, who was listed as a subscriber through both Zeigel and KCG, asserted the privilege against self-incrimination, pursuant to the Fifth Amendment of the United States Constitution, in response to questions regarding his employment with two of the defendant groups.

11. Finkelstein and Grunbaum asserted the Fifth Amendment privilege in response to questions regarding the representations made by them and others in the applications for Empire coverage.

12. The Court finds that the defendant groups, with the exception of Medin, were fictitious entities, and that the subscribers enrolled for coverage through these entities were not their employees. Accordingly, the Court finds that the documentation submitted to Empire by Finkelstein, Grunbaum and others on behalf of the defendant groups

contained material misrepresentations upon which Empire relied in determining whether to extend insurance coverage.

13. The defendant groups were interconnected as evidenced by the group administrator applications and other documents submitted to Empire by the defendant groups:

(a) The address listed on the group administrator application for KCG is the same as that listed for Medin on its group administrator application and on correspondence sent to Empire by Finkelstein on Medin's behalf;

(b) Even though each of the defendant groups listed a different individual as its administrator, the telephone number listed on the group administrator application for G. Contracting is the same as that listed on the group administrator application for Zeigel and Kent Mills;

(c) The telephone number and the address listed on the group administrator application for Bredis are the same as those listed for Mardon;

(d) The address listed for Kent Mills includes the same post office box as that listed for East Imports.

14. The fact that many subscribers enrolled for Empire coverage through several of the defendant groups also shows that the defendant groups were interrelated. *See infra* ¶ 10.

15. In addition, the premium checks submitted to Empire by the defendant groups show that the defendant groups were interconnected:

(a) Each premium check received by Empire from the defendant groups contained an ink-stamped imprint of the particular group's name and group number (for example, a premium check from Kent Mills was ink-stamped "KENT MI 334234"; a premium check from Hospital Software was ink-stamped "HOSPIT 337422");

(b) Medin, Hospital Software, East Imports, Bredis, and Zeigel all drew funds on a Manufacturer's Hanover account, under the name "077 REALTY," to pay premiums to Empire.

16. Empire argued at trial that Finkelstein, and Grunbaum to a lesser extent, were at the center of the fraudulent scheme. The group administrator applications, subscriber applications, and correspondence sent to Empire show that while Finkelstein was the group administrator for Medin he was also enrolled for Empire coverage as an employee not only of Medin but of KCG and G. Contracting as well. Although Finkelstein's counsel argued that Finkelstein had not in fact executed certain documents that appeared to contain his signature, the Court finds that the documents that Empire claims Finkelstein executed were executed by Finkelstein.

17. In addition, Finkelstein's home address—1850 47th Street, Brooklyn, New York—appears on numerous documents relating to the defendant groups. Finkelstein's home address appears as the address for several subscribers enrolled for coverage through several of the defendant groups and as the business address for Kent Mills. Finkelstein's home telephone number—718–435–5647—was listed as the business telephone number for Avrechai, and as the telephone number for David Schwartz, a person listed as the contact person for Medin. Finkelstein's home telephone number also appeared as the telephone number for Medin on billing statements returned to Empire from Medin.

18. Finkelstein possessed, and produced to Empire in discovery, correspondence and documents sent by Empire to Bredis, Medin, and East Imports at the addresses listed for those entities in their group administrator applications.

19. Finkelstein asserted the Fifth Amendment privilege in response to questions regarding his connection to or knowledge of the defendant groups.

20. Grunbaum is listed—as Simon Green—as the group administrator on the group administrator application for Hospital Software. The Court finds that Grunbaum and Simon Green are the same person. Counsel for Grunbaum executed a stipulation, dated April 7, 1992, in which Grunbaum agreed that service of the summons and complaint in this action, which had been made on Simon Green, was valid service as to Grun-

baum. Moreover, Pinchus Horowitz testified at trial that he had a meeting with Grunbaum and Finkelstein at which they showed him a copy of what he believed was the complaint in this action. He testified that the meeting took place in late 1991.

21. Grunbaum asserted the Fifth Amendment privilege in response to questions directed at whether he knew of an entity called Hospital Software.

22. The Court finds that the defendant groups were interrelated and that both Finkelstein and Grunbaum were affiliated with at least one of the defendant groups. The Court also finds that an interrelationship existed among Finkelstein, Grunbaum, and the defendant groups.

23. Empire sent through the United States mail to each of the defendant groups monthly billing statements setting forth the amount of premium owed to Empire by each of the defendant groups. Finkelstein, Grunbaum, each of the defendant groups, and several hundred subscribers enrolled for Empire coverage through the defendant groups sent insurance applications, correspondence, and payments to Empire through the mail.

24. In order to pay premiums, Bredis, East Imports, Avrechai, Kent Mills, and Medin sent to Empire checks drawn from bank accounts located outside New York State as premium payments.

25. In order to pay premiums, certain of the defendant groups wired funds to Empire through money orders issued from bank accounts located outside New York State.

26. Harry Pantos, director of Empire's Group Integrity Unit, testified, and the Court finds, that between 1984 and 1991 Empire paid out $33,366,701 in claims made by subscribers enrolled for coverage through the defendant groups, and that, during that same time period, Empire received $5,941,-621 in premiums from the defendant groups.

### CONCLUSIONS OF LAW

#### The RICO Claims

1. In order to prove a RICO violation, a plaintiff has two burdens of proof. First, he must prove that: (1) the defendant, through the commission of at least two predicate acts, (2) constituting a "pattern" (3) of "racketeering activity," (4) conducts or participates directly or indirectly in the affairs of an "enterprise," (5) the activities of which affect foreign or interstate commerce. *See* 18 U.S.C. § 1962(c); *see also Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). Second, a plaintiff must prove that he was "injured in his business or property by reason of [the] violation." 18 U.S.C. § 1964(c); *see Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 24 (2d Cir.1990).

2. In drafting the RICO statute, "Congress sought to define [the word enterprise] as broadly as possible 'includ[ing]' within it every kind of legal entity and any 'group of individuals associated in fact although not a legal entity.'" *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir.1989) (quoting 18 U.S.C. § 1961(4)). The proof at trial was sufficient to establish the existence of an "enterprise" comprised of Finkelstein, Grunbaum, Pinchus Horowitz, and others associated therewith in an effort to obtain from Empire insurance coverage for those whom could not otherwise obtain such coverage.

3. The evidence also established that activities of the "enterprise" affected both interstate and foreign commerce. The "enterprise" solicited potential subscribers from several states as evidenced by the premium checks received by Empire from banks located outside of New York. Likewise, the Dvir complaint indicated that the "enterprise" undertook foreign solicitation.

4. Empire alleges that numerous mail and wire frauds are the predicate acts supporting its RICO claim against Finkelstein and Grunbaum. The offenses of mail and wire fraud each require proof of the same two elements: that defendant (1) knowingly participated in a scheme to defraud; and (2) knowingly used the mails—or wires— to further the scheme. *Laro, Inc. v. Chase Manhattan Bank*, 866 F.Supp. 132, 136–37 (S.D.N.Y.1994); *see O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 706 (2d Cir.1990). A showing of intentional fraud or reckless indifference to the truth is necessary to establish either offense. *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d

46, 49 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989) (en banc); *O'Malley,* 896 F.2d at 706. The plaintiff must have reasonably relied on the misrepresentations by the defendant to further the scheme. *See Metromedia Co. v. Fugazy,* 983 F.2d 350, 368 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993).

5. Finkelstein and Grunbaum participated with others in a scheme to defraud Empire—they established fictitious groups through which they would enroll individuals in need of urgent medical care for insurance that they could not otherwise obtain. Empire relied on the misrepresentations that constituted the scheme. Empire's reliance was reasonable.

6. The evidence at trial indicated that Finkelstein and Grunbaum mailed various documents to Empire, including group administrator applications, correspondence, and caused other documents to be mailed, including individual subscriber applications, billing statements, and payments. Thus, Finkelstein and Grunbaum knowingly used the mails to further the scheme. *See Com–Tech Assocs. v. Computer Assocs. Int'l Inc.,* 753 F.Supp. 1078, 1092 (E.D.N.Y.1990), *aff'd,* 938 F.2d 1574 (2d Cir.1991); *see also United States v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir.1989).

7. The evidence at trial indicated that Finkelstein and Grunbaum caused funds to be transmitted by wire from banks located outside New York to Empire. Finkelstein and Grunbaum knowingly used the wires to further the scheme. *See United States v. Corey,* 566 F.2d 429, 430–31 (2d Cir.1977); *see also Polycast Technology Corp. v. Uniroyal, Inc.,* 728 F.Supp. 926, 946–47 (S.D.N.Y.1989).

8. Empire established numerous mail and wire frauds as predicate acts supporting its RICO claim against Finkelstein and Grunbaum. Those misrepresentations were reasonably relied on by Empire in making decisions to provide coverage and pay for treatment.

9. Empire alleges that the combination of these predicate acts constitute a pattern of racketeering activity. In order to prove a pattern of racketeering activity a plaintiff must show that the "predicates are related, and that they amount to or pose a threat to continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1988) (emphasis omitted). Predicates are related if they " 'have the same or similar purposes, results, participants, victims, or methods of commission.' " *Id.* at 240, 109 S.Ct. at 2901 (citing 18 U.S.C. § 3575(e)). Predicates pose a threat of continuity where they "can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Id.* at 243, 109 S.Ct. at 2902.

10. Finkelstein and Grunbaum used the mechanics of the business of providing insurance coverage to further their scheme. Between 1984 and 1991, the predicates—the mailings and the wire transfers—infested that business on at least a monthly basis. Each mailing and wire transfer was undertaken for the same purpose. The victim was always the same. As such, the predicates are related. *See Indelicato,* 865 F.2d at 1382. In addition, there being no evidence that Finkelstein's and Grunbaum's "enterprise" had anything but an illegal purpose, the predicates also amount to a threat to continued criminal activity. *See H.J. Inc.,* 492 U.S. at 243, 109 S.Ct. at 2902–03.

11. Empire established that the combination of the predicate acts constituted a pattern of racketeering activity.

12. Through the commission of these predicate acts, Finkelstein and Grunbaum "participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs." As group administrators for at least two of the defendant groups, Finkelstein and Grunbaum each "participate[d] in the operation or management of the enterprise itself." *Reves v. Ernst & Young,* —— U.S. ——, ——, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993).

13. Finkelstein and Grunbaum violated 18 U.S.C. § 1962(c).

14. Empire alleges that Finkelstein and Grunbaum agreed with each other and others to violate 18 U.S.C. § 1962(c). In order to establish RICO conspiracy liability, pursuant to 18 U.S.C. § 1962(d), a plaintiff must show that a defendant agreed to "commit the substantive racketeering offense through agreeing to participate in two predicate acts ... and that he [knew] the general nature of the conspiracy and that the conspiracy extends beyond his individual role." *United States v. Rastelli,* 870 F.2d 822, 828 (2d Cir.1989) (citations omitted). Although there was no direct evidence at trial sufficient to establish that Finkelstein, Grunbaum, and others had agreed to violate § 1962(c), there was circumstantial evidence strongly indicating that Finkelstein, Grunbaum, and others acted in concert with knowledge of the grand scheme. When questioned, Finkelstein and Grunbaum asserted the Fifth Amendment privilege against self-incrimination. Had Finkelstein and Grunbaum not asserted the privilege, the Court infers that they would have been damaged by their testimony. *See Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1975) (stating that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them").

15. Finkelstein and Grunbaum violated 18 U.S.C. § 1962(d).

16. Empire suffered damage in the amount of $27,425,080 which was directly and proximately caused by Finkelstein's and Grunbaum's violations of 18 U.S.C. § 1962(c)–(d). *See Hecht,* 897 F.2d at 24.

17. Finkelstein and Grunbaum are jointly and severally liable to Empire for treble the amount of Empire's damage, pursuant to 18 U.S.C. § 1964(c). That amount is $82,275,240.

*The State Law Claims*

18. Empire also seeks to hold Finkelstein and Grunbaum liable on the ground of common law fraud. Finkelstein and Grunbaum made material misrepresentations to Empire with intent to defraud. *See Idrees v.*

*American Univ. of the Caribbean,* 546 F.Supp. 1342, 1346 (S.D.N.Y.1982). Empire's justifiable reliance on the misrepresentations proximately caused its injury. *See id.* As such, the Court finds that Finkelstein and Grunbaum are jointly and severally liable to Empire in the amount of $27,425,080 on the ground of common law fraud.

19. This case was tried as a fraud case; there is no basis in the record for Empire's breach and recision of contract claims. Those claims are dismissed.

*Statute of Limitations*

20. RICO is governed by a four-year statute of limitations. *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). A plaintiff must bring its RICO claim within four years from the date it discovered or should have discovered injury to its business arising therefrom. *See Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1102–05 (2d Cir.1988); *see also Moeller v. Zaccaria,* 831 F.Supp. 1046, 1050–51 (S.D.N.Y.1993). Empire filed the complaint in this action on December 6, 1991. Thus, Empire can recover on its RICO claims only for injuries to its business that it discovered or should have discovered on or after December 6, 1987. Empire began providing the requested insurance coverage to individuals through the defendant groups in 1984. It did not discover injuries until well after December 6, 1987—Empire had only learned of Dvir's allegation a few months before December 6, 1987. The Court concludes that Empire neither discovered nor should have discovered injury to its business prior to December 6, 1987.

*Conclusion*

22. For the above reasons, the Clerk of the Court is directed to enter judgment in favor of Empire and against Finkelstein and Grunbaum in the amount of $82,275,240, plus costs and reasonable attorney's fees.

SO ORDERED.