**UNITED STATES of America ex rel. Cornelius LUCAS, Petitioner-Appellant,**

v.

**Paul J. REGAN, Chairman, New York State Division of Parole, Respondent-Appellee.**

**No. 1070, Docket 74–1094.**

United States Court of Appeals, Second Circuit.

Argued May 16, 1974.

Decided Sept. 3, 1974.

Oakes, Circuit Judge, dissented and filed opinion.

**2**

Before KAUFMAN, Chief Judge, and HAYS and OAKES, Circuit Judges.

HAYS, Circuit Judge:

Appellant commenced this action for a writ of habeas corpus alleging that an impermissibly suggestive pre-trial identification and certain errors in the state court trial at which he was convicted deprived him of various constitutional rights. The district court found no deprivation of constitutional rights and de-nied the writ. 365 F.Supp. 1290 (E.D. N.Y.1973). We affirm.

On the evening of April 23, 1964, three men gained entry to the apartment of Carl and Almeta Gardner by giving a false name. They proceeded to rob the Gardners of $140.00. In the course of the robbery Mr. Gardner was struck with a gun and had to be hospitalized.

Appellant, Edward Polhill and Norman Adderley were arrested and charged with the crimes. Shortly before trial Adderley pleaded guilty to a charge which was reduced in return for his promise to testify. Appellant was tried with Polhill before a jury and convicted in the Supreme Court, Kings County, New York. On October 15, 1968, the Supreme Court, Kings County, denied coram nobis relief. The Appellate Division affirmed on a consolidated direct appeal and coram nobis appeal. 33 A. D.2d 994, 308 N.Y.S.2d 299 (2d Dep't 1970). The New York Court of Appeals affirmed, 28 N.Y.2d 761, 321 N.Y.S.2d 371, 269 N.E.2d 914 (1971), rehearing denied, 29 N.Y.2d 549, 324 N.Y.S.2d 95, 272 N.E.2d 583 (1971). The United States Supreme Court denied certiorari. 404 U.S. 994, 92 S.Ct. 542, 30 L.Ed.2d 547 (1971). Appellant then commenced this action for a federal writ of habeas corpus, which the district court denied.

I.

Appellant claims the state trial court deprived him of a fair trial by denying a continuance to locate a material witness and to obtain psychiatric records for purposes of cross-examining a prosecution witness.

 After the robbery Mrs. Gardner identified Polhill and Adderley as two of the robbers. After some hesitation she identified one Ulysses Bryant as the third robber. Shortly, thereafter, however, she was shown Lucas. She immediately stated that she had been mistaken in her earlier identification and that Lucas was actually the third robber. Defense counsel did not learn of Mrs. Gardner's earlier identification of

Bryant until a year later on May 21, 1965, the second day of the trial.[1] During the next four days the defense tried but failed to locate Bryant. On May 25, the last day of the trial, the defense moved for a continuance, which the trial judge denied.

In Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964), the Supreme Court said:

> "The matter of continuance is traditionally within the discretion of the trial judge. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."

Under the circumstances of this case the trial judge did not abuse his discretion in denying a continuance. It was not crucial that Bryant appear as a witness. The defense did not want him primarily to testify—the jury already knew that Mrs. Gardner had originally identified another as the third robber. The defense wanted Bryant primarily to show the jury how different his appearance was from Lucas'. But this could have been accomplished with photographs or by examination of other witnesses.

More important, the defense did not show that a reasonable continuance would enable it to locate Bryant. The probability of locating the witness must be considered in the light of "the reasons presented to the trial judge at the time the request is denied." Ungar v. Sarafite, supra, at 589, 84 S.Ct. at 850. See also United States v. Ellenbogen, 365 F.2d 982, 986 (2d Cir. 1966), cert. denied, 386 U.S. 923, 87 S.Ct. 892, 17 L.

Ed.2d 795 (1967); Neufield v. United States, 73 App.D.C. 174, 118 F.2d 375, 380 (1941), cert. denied, 315 U.S. 798, 62 S.Ct. 580, 86 L.Ed. 1199 (1942). The defense here did not even indicate what steps had been taken or would be taken to locate Bryant.

■ The denial of a continuance to secure psychiatric records of Adderley was also within the area of the trial court's discretion. The defense hoped to attack Adderley's credibility by showing that his mental state was poor. The defense claims that it first learned of Adderley's psychiatric history at the trial. The judge signed a subpoena for the records on the second day of the trial. Four days later the records still had not been produced. In seeking a continuance the defense did not indicate, and before this court still does not indicate, what measures it took to secure compliance with the subpoena. Appellee here claims, and appellant does not deny, that a single phone call would have insured production of the records.

The trial court had to exercise its discretion in determining whether the records were so important that a continuance was warranted pending their production. At the time of the motion the significance of the records was unknown. Defense counsel had not examined them or, apparently, even attempted to examine them. The defense had already brought out on cross-examination that Adderley had undergone psychiatric examination. It was not unreasonable for the trial court to assume, in the absence of proof to the contrary, that the records of these examinations would not disclose any additional information of great importance to the trial. Under these circumstances denial of a continuance did not deprive appellant of due process.

---

1. Appellant claims that under Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution was required to disclose this information before trial and that if this had been done the defense would have had ample time to locate Bryant. Neither Brady nor any other case we know of requires that disclosures under Brady must be made before trial. We would need a much more convincing showing that it would have been impossible to locate Bryant in the time available after disclosure before we would be willing to entertain such a claim.

## II.

██ Three days after the robbery, and 90 minutes after she had identified Bryant, Mrs. Gardner was shown Lucas alone. She immediately stated that her prior identification of Bryant was incorrect and that Lucas was the third robber. Appellant claims that this showup was so impermissibly suggestive as to lead to a substantial likelihood of misidentification.

In Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Supreme Court held that in cases like that now before us, where the identification occurred before the decision in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), a confrontation is not objectionable even though impermissibly suggestive, if it is reliable.

> "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Neil v. Biggers, supra, 409 U.S. at 199, 93 S.Ct. at 382.

Applying this standard, we find Mrs. Gardner's identification reliable. She testified that she had been able to see the robbers at close range when they first entered the apartment, that the light in the apartment was good, and that she was able to watch the robbers the entire time they were in the apartment. She stated that she couldn't forget their faces and that they made an impression on her. As soon as she saw Lucas at the station house she withdrew her prior identification of Bryant and stated that Lucas was the third robber. This identification took place only three days after the robbery. Although she claimed to have given the police a description of the robbers before the showup, the nature of the description does not appear in the record. To the extent that the appearance of Bryant differed from that of Lucas, her identification of Bryant might be taken to be a prior inaccurate description. But in view of the other factors supporting the reliability of the identification, this single factor does not render the identification unreliable. The prior identification of Bryant was merely one factor affecting the credibility of Mrs. Gardner which the defense could and did raise to the jury.

## III.

██ Shortly before the trial Adderley was permitted to plead guilty to a reduced charge in return for his promise to testify. Appellant claims that under the bargain Adderley would not have obtained the reduction in the charge unless his testimony implicated Appellant and Polhill. He claims that at the trial Adderley denied he would lose the bargain unless he implicated the defendants and that the trial judge and the prosecutor failed to correct this testimony. Indeed, appellant claims that the trial judge himself supported Adderley's claim. Appellant argues this denied him a fair trial.

Immediately after the judge accepted the plea he explained to Adderley the scope of his duty in no uncertain terms:

> The Court: "Bail continued. When you take the stand, I want the Gospel truth. I don't care if it varies from what you said, you tell the Gospel truth."

> Defendant Adderley: "I will, your Honor."[2]

---

2. The trial judge followed this admonition with another:

The Court: "And when you are asked whether you are getting anything, don't you hesitate. You must tell what you are being promised and what you hope to get; do you understand that?"

Defendant Adderley: "Yes, sir."

The Court: "I don't want any monkeying around or anything of that character."

Thus it was accurate for Adderley to testify, and for the trial judge to support the testimony, that his promise was only to tell the truth.

Affirmed.

OAKES, Circuit Judge (dissenting):

I respectfully dissent.

The pretrial identification of appellant by Mrs. Gardner was unnecessarily and impermissibly suggestive. Under all of the circumstances, Mrs. Gardner's subsequent in-court identification of the appellant as the third robber was unreliable and presented a substantial likelihood of an irreparable mistaken identification. Thus I believe that a new trial should be ordered under Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); and our Second Circuit cases such as United States ex rel. Rivera v. McKendrick, 448 F.2d 30, 34 (2d Cir. 1971), and United States ex rel. Phipps v. Follette, 428 F.2d 912, 915 (2d Cir. 1970). See also United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

The majority concedes, as it is required to, that the show-up procedure used to identify the appellant was impermissibly suggestive. There were three robbers in the Gardner apartment. Three days after the robbery, a lineup was conducted at the station house at which Mrs. Gardner selected Adderley, Polhill and Ulysses Bryant [1] as the three. Several hours later, these three men were brought in individually in a three part show-up by the Assistant District Attorney whereupon Mrs. Gardner confirmed her identifications. Ninety minutes later, however, appellant, who was bearded and 39 years old (Bryant was cleanshaven and 25) was brought to appear alone in a show-up before Mrs.

Gardner. She then retracted her prior identification of Bryant and identified the appellant. In so doing it seems clear that Mrs. Gardner must have been influenced by the police and prosecutor's apparent belief—from the show-up of Lucas—that her prior identification of Bryant was mistaken and that the appellant was a participant in the robbery. Cf. Neil v. Biggers, 409 U.S. at 196–197, 93 S.Ct. 375, and Foster v. California, 394 U.S. at 443, 89 S.Ct. 1127. The show-up was clearly suggestive, and, indeed, it was unnecessarily so; unlike the victim in Stovall, Mrs. Gardner was neither injured nor indisposed at the time of the idenification. Bryant and the others had been placed in a lineup earlier in the day. Neither the State nor the majority suggest any reason why the appellant could not also have been displayed to Mrs. Gardner in a lineup. See Note, Pretrial Identification Procedures—Wade to Gilbert to Stovall: Lower Courts Bobble the Ball, 55 Minn.L. Rev. 779, 789 (1971). See also Levine and Tapp, The Psychology of Criminal Identification: The Gap from Wade to Kirby, 121 U.Penn.L.Rev. 1079, 1081 (May 1973): "In fact the lineup procedure itself was developed by the British police because show-up confrontation was considered grossly suggestive and unfair." See generally P. Wall, Eyewitness Identification in Criminal Cases (1965); N. Sobel, Eyewitness Identification, Legal and Practical Problems (1972).

I come then to the question whether, under the "totality of circumstances" the identification by Mrs. Gardner in court was sufficiently reliable even though the confrontation procedure was suggestive. The teaching of Neil v. Biggers, 409 U.S. at 198–199, 93 S.Ct. 375, is that the factors to be considered in evaluating the likelihood of misidentification include (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' de-

---

1. Adderley pleaded guilty to a lesser charge with respect to the robbery and subsequently testified for the prosecution at Lucas' trial.

Polhill was plainly guilty and was convicted at trial with Lucas. Bryant was misidentified.

gree of attention; (3) the accuracy of the witness' prior identification of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. In my view, these factors were here insufficiently met so that, indeed, there was "a very substantial likelihood of irreparable misidentification." *See* United States ex rel. Phipps v. Follette, 428 F.2d at 915.

First, Mrs. Gardner's opportunity to observe the third robber at the time of the crime was minimal. Under her testimony the third robber moved in and out of the apartment searching the various rooms of the apartment for money; he had no physical contact with her. Adderley had tied her to a bed with her face down. She was so hysterical that she did not know how much time elapsed during the incident.

Her attention, moreover, was focused on Adderley, who had put a gun to her head as soon as the door was opened, and held the gun to her head throughout the entire incident, threatening to kill her on three different occasions. Under the "totality of circumstances," her degree of attention to the third robber must have been minimal. *See* United States ex rel. Rivera v. McKendrick, 448 F.2d 30, 34 (2d Cir. 1971).

As to the third Neil v. Biggers factor, Mrs. Gardner apparently gave no prior description of the third robber, or, if she gave one, no record of it has been preserved. In view of the fact, however, that she first identified a cleanshaven 25-year-old as the third robber, we may take it that any prior description she might have given would have been substantially different from that of a 39-year-old bearded man.

The next factor is the level of certainty of the person making the identification, but the Court was speaking to an initial identification, not one as here where there was a prior identification of another person, dissimilar in appearance, as the criminal. Admittedly, Mrs. Gardner spoke with certainty when she identified appellant. Her level of certainty during the prior identification of Bryant, however, had also been quite high. She was definitive and positive in identifying him as the third robber who searched the apartment for money. The transcript of her station house identification contains little doubt on her part as to Bryant's having been the third robber.[2]

At trial, to be sure, she did testify that she had been uncertain about Bryant. One can only suppose that this trial testimony was in explanation of her change of mind and change of identification. The fact that she was equally certain when she did ultimately identify Lucas does not, for me, carry much weight, because this was after an impermissibly and unnecessarily suggestive show-up. Three days after the commission of the crime she was so angry (and properly so), or so upset or anxious, she was apparently willing to identify anyone. Proof of this is that she made a mistaken identification of Bryant not once, but on two occasions on the very same day of her identification of Lucas.

Beyond this, her inability to make a reliable identification of Lucas is shown by the fact that she was apparently mistaken in her belief that he had worn a hat during the commission of the crime. She testified that only one of the three men had worn a hat, and at the station house when Bryant was brought in for his show-up without a hat, she asked

---

2. The transcript shows that she expressed some initial uncertainty about identifying Bryant as the third robber. Once she saw him with a hat on, however, her identification was positive:

Q. Who is that man?
A. That's one of the men that came to my house and held me up.

Q. What did he do?
A. He ran around. He was doing the searching. He was tearing up the house. He was looking to see if I had the money in the house.
Tr. 321.

that he wear one. When he put a hat on, her identification was positive. The other witnesses—Mrs. Gardner's husband and a detective who saw the robbers enter a car outside the building—indicated that only Polhill had been wearing a hat. If, as the majority says, Mrs. Gardner could not forget the faces of the robbers, which they claim made such an impression upon her, how could she misidentify Bryant and how could she think that the third robber was the one wearing a hat?

It goes to make this case doubly compelling for a new trial that it was not until the trial that the defense learned that there had been a prior misidentification of Bryant. The defense wished to produce Bryant, presumably to show the jury how different his appearance was from Lucas'. While the majority says that this could have been accomplished by photographs or by examination of other witnesses, it is obvious that the production of Bryant himself would have been much the superior evidence, and there is no showing or indication that there were any photographs that would have been available upon diligent search. While the majority says that the defense did not even indicate what steps had been taken or would be taken to locate Bryant, the defense was not asked to do this by the court, and I cannot see what relevancy that has to whether or not the trial judge's discretion should have been exercised in favor of granting the continuance, under Ungar v. Sarafite, 376 U.S. 575, 589, 84 S. Ct. 841, 11 L.Ed.2d 921 (1964). *See also* United States v. Ellenbogen, 365 F. 2d 982, 986 (2d Cir. 1966), cert. denied, 386 U.S. 923, 87 S.Ct. 892, 17 L.Ed.2d 795 (1967).

There was very little other evidence implicating Lucas as the third robber, so that it cannot possibly be said—nor does the majority advance the suggestion—that the error in admitting Mrs. Gardner's in-court identification testimony was harmless. *See* United States ex rel. Springle v. Follette, 435 F.2d 1380, 1384 n.4 (2d Cir. 1970). Detective

Broughton's identification of appellant was based only on several seconds of observation in the night, made from 150 feet away. The testimony of Adderley was inherently suspect and under New York law required corroboration, N.Y. Crim.Proc.Law § 60.22 (McKinney's Consol.Laws, c. 11–A 1971); in addition, there was some doubt cast on his testimony on the basis of the promise made to him in return for his testimony as a prosecution witness. In any event, there was an inconsistency between Broughton's testimony that he did not observe a fourth man in the car and was certain that there were three and Adderley's to the effect that there was a fourth man in the car who never went into the apartment. The case against appellant relied heavily on Mrs. Gardner's testimony. The jury was out for eight hours, indicating doubt on their part. The only way justice can be served, in my view, is by a new trial.

The majority seems to suggest that the factors which relate to the basic unreliability of Mrs. Gardner's identification of the appellant are merely issues which the defense could have raised and did raise to the jury on cross-examination and summation. We are presented here, however, with such a compelling case of likely misidentification that the only way to remedy the potential harm to the defendant would be through the exclusion of Mrs. Gardner's in-court identification.

The psychology of criminal identification is still in a state where a great deal of research has to be done—research by social scientists as well as by lawyers. *See* Marshall, Marquis and Oskamp, Effects of Kind of Question and Atmosphere of Interrogation on Accuracy and Completeness of Testimony, 84 Harv.L. Rev. 1620, 1639–40 (1971). *See also* Levine and Tapp, The Psychology of Criminal Identification: The Gap from Wade to Kirby, 121 U.Penn.L.Rev. at 1130. The best thinking on the subject is that "the dangers from fallible sense perception and memory and from suggestive influence are overwhelming."

*Ibid.* The fact that Neil v. Biggers, *supra*, and Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), do narrow and are thought to cut back on *Wade* and *Stovall* does not in any way lessen our task as judges in arriving at fair and just decisions in identification cases. Here the eyewitness identification was exceedingly doubtful at best. It is true that this was a pre-*Wade* conviction and hence that no suppression hearing was required. We have all the more reason, however, to examine in depth whether or not a fair trial was had and whether or not Mrs. Gardner's identification evidence was fairly admitted.

I would vote, as did Judge Breitel when the appeal was initially heard by the New York Court of Appeals,[3] to reverse and to remand.

3. People v. Lucas, 28 N.Y.2d 761, 321 N.Y.S.2d 914, 269 N.E.2d 914, cert. denied, 404 U.S. 994, 92 S.Ct. 542, 30 L.Ed.2d 547 (1971).