Raymond CLARK, Petitioner,

v.

UNITED STATES of America, Respondent.

No. 97 Civ. 1882(RO).

United States District Court, S.D. New York.

April 14, 2005.

Raymond Clark, pro se.

*MEMORANDUM AND ORDER*
OWEN, District Judge.

In the 1980's Raymond Clark, among a number of others, was a co-conspirator with James Jackson, who more or less took over the Nicky Barnes drug empire in Harlem, New York City. Clark was convicted August 25, 1988 after a four month trial before me and was sentenced to 50 years imprisonment. The enterprise distributed millions of dollars of narcotics over a seven year period in New York, Connecticut, Washington, D.C. and elsewhere, and its members committed at least seven murders to promote the enterprise with Clark, according to the evidence at the trial, personally shooting three of them: Norman Bannister, Beverly Ash and Steven Ash. Clark's memorandum on this motion erroneously asserts that "Hearsay from a confidential informant was the only evidence against Clark." (p. 16). The fact is to the contrary. James Jackson, the leader who had taken a plea,

testified to Clark telling him just how he (Clark) had committed each of the three murders.

As to the Bannister murder:

Q. What did Clark tell you about what happened in the bar?

A. He told me that when he went in the bar, the bar was pretty crowded and that Norman was playing Pac-Man and that when he seen J.R. on the door, he went behind Norman Bannister and shot him in the head.

Q. Would you describe Romar's [Clark was frequently referred to as Romar, tr. p. 341] demeanor as he talked to you about the homicide?

... Just describe what, if anything, you observed about him as he was telling you about the homicide?

A. That he was bragging.

Tr. 277–278.

As to the Beverly Ash murder:

Q. Did there come a time after that that you had a conversation with the defendant Raymond Clark?

A. Yes.

Q. When was that?

A. A few days after Mike told me about staying away from the Monarch Bar.

Q. Where were you when you had the conversation with Clark?

A. I was in Eugene Romero's apartment in The Bronx on Clinton Avenue.

Q. Who lived in that apartment?

A. Eugene Romero, Sharise, and Romar [Clark].

Q. Who was present during the conversation?

A. Romar, Sharise and Mike, but Mike was in the bedroom along with Sharise when the conversation took place with myself and Romar.

Q. So just you and Romar were alone when you had the conversation?

A. Right.

Q. Would you tell us what Romar said?

A. Romar said, "That was my work, the other night up in the Monarch Bar with Shamecca [Beverly Ash]. That was me, red alert. That was my work."

And he went to the closet and he pulled out a rubber mask, white face, dark hair, with the eyes cut out and the nose cut out, and he put it on. He also took out a dark trench coat and he put it on. And he says, "You want to see how I did it?" And he came up to me and he said, "Yes, they think it was a white guy. It wasn't a white guy. It was me, red alert." And he came up to me and he had his back hunched and he said, "I walked in with my back hunched down and she was sitting at the bar stool and I just shot her."

Q. What type of mask was it that defendant Clark was wearing?

A. It was like one of those Halloween masks be, a rubber mask with dark hair, Caucasian color, with the eyes and the nose cut out, that you could slip over your head.

Tr. 320–322.

And as to the Steven Ash murder:

A. A few days right after the homicide.

Q. Where did you have the conversation?

A. I had the conversation with him [Romero] at his apartment on Clinton Avenue in The Bronx.

Q. Who was present at the conversation?

A. Myself, Romar [Clark] Sharise was in the apartment. She was in the bedroom.

Q. Who was actually present during the conversation?

A. Myself, Romar and Eugene Romero.

Q. When you say Romar, you are referring to the defendant Raymond Clark?

A. Yes.

Q. Will you tell us what was said?

A. Mike told me what had happened that night Steven got murdered. He told me that Romar was sitting on the couch in the living room. Sharise answered the door. He was in the master bedroom, Mike, sitting on the edge of the bed.

Q. Mike Romero?

A. Yes. Sharise told Steve, Steven Ash, Mike was in the bedroom. Steven went in there and Mike was sitting at the edge of the bed and Steven Ash was standing right directly in front of him with his back facing the door. He had his hands in his pocket and Romar came up from behind and shot him in the head.

Q. What, if anything, did Romero tell you happened after that?

A. He said, "the bastard, man, shitted all over himself. We had to put him in the tub." He said they put him in the tub, they ran the shower on him, shower water on him. They stayed in the apartment a few minutes. Then all, Sharise, Mike and Romar, left and went to Pathmark and got some baggies, some garbage bags and some ropes. Steven had a weight setup there that he was working out on and they put some weights in there, and that him and Romar carried Steven Ash from the apartment to the inside garage and put him in the trunk of the car.

Q. Did he tell you what, if anything, happened after that?

A. He didn't tell me where they put the body or nothing. He said they just put him in the trunk of the car and that's it.

Q. Did there come a time when Romero left the room and you were just alone with Romar?

A. Yes.

Q. What, if anything, transpired at that time?

A. As soon as Mike left the room, Romar said, "Mike talk about he carried the body. Man, man, I carried that body. Mike can't carry that body. Me, I carried the body all the way down."

Tr. 341–343.

Clark's conviction was affirmed by the Second Circuit on February 26, 1990, the Court stating at 897 F.2d 639 at 646 "we have carefully reviewed the claims of the other appealing defendants [including Clark] and, finding all to be without merit, we affirm the conviction of each."

Sometime just prior to July 8, 1988, some seven weeks before the verdict and during the Government's direct case, the Government provided Clark certain New York City Police Department reports from the city's homicide files of the two Ash victims and Bannister. The Government had inadvertently failed to turn over those reports to Clark earlier or prior to trial notwithstanding the existence of some material in those reports with the opinion statement of the authors that co-defendant Mark Reiter, rather than Clark, had actually committed the Ash murders. Clark, on July 8, 1988, immediately moved for a mistrial arguing that "he should have had that material as exculpatory before the trial began." Tr. 5177. After extensive hearings over several weeks during the trial I declined to permit the reports into evidence or to allow Clark to call the police officers who authored the Ash reports as witnesses on various grounds, the principal

one being that both the testimony of the of law enforcement officers and their reports never got beyond "hearsay with a capital H," Tr. 7990. On the direct appeal to the Second Circuit from his conviction (88–1493) Clark contended that he was entitled to a new trial because the Government (1) belatedly produced several reports containing allegedly exculpatory information about his involvement in several charged murders, and (2) that at trial the District Court erred in excluding those reports and denying him the testimony of the law enforcement officers who prepared them. The Government asserted in its brief on the appeal that Clark's claims were frivolous because Clark had ample time to investigate the contents of the reports and because all of the proffered evidence *was* properly excluded as hearsay.

The Government's brief on the direct appeal authored in 1989, starting at page 114 and running into page 127 (which pages are set forth as Appendix A hereto) dealt in overwhelming detail rebutting Clark's position, and the Circuit in 1990 concluded his claim "to be without merit," as quoted above.

Seven years later Clark, in 1997, under Index No. 97 Civ. 1882, filed the instant § 2255 motion raising the identical question flowing from the same reports under the heading "QUESTIONS PRESENTED" as: "WHETHER TRIAL COUNSEL WAS FORCED TO RENDER INEFFECTIVE ASSISTANCE OF COUNSEL BECAUSE OF THE GOVERNMENT['S] FAILURE TO TURN OVER EXCULPATORY EVIDENCE IN A TIMELY MANNER."

Also on his accompanying pro se form, Clark again, while in different language repeated the identical grounds:

A. Ground One: COUNSEL WAS MADE TO RENDER INEFFECTIVE ASSISTANCE OF COUNSEL

Supporting FACTS (tell your story *briefly* without citing cases or law):

THE GOVERNMENT CAUSED COUNSEL NOT TO BE ABLE TO INVESTIGATE EXCULPATORY REPORTS THAT WOULD HAVE CAUSED THE JURY TO FIND REASONABLE DOUBT CONCERNING CLARKE.

B. Ground Two: CLARKE WAS DENIED DUE PROCESS OF LAW AT HIS TRIAL.

Supporting FACTS (tell your story *briefly* without citing cases or law):

BY THE GOVERNMENT TURNING OVER POLICE REPORTS INTENTIONALLY TWO WEEKS[1] TILL THE END OF TRIAL CAUSED CLARKE NOT TO HAVE A FAIR CHANCE AT FIGHTING HIS CASE AGAINST THE GOVERNMENT.

Somehow his § 2255 proceeding was administratively closed in June 2000 and then was subsequently reactivated by Clark's motion in February 2002.

As stated above, the identical issue had been raised and extensively considered at the trial, and then extensively considered and rejected in summary language on the direct appeal in summary language, and whatever the reasons for the delay in getting it before me again under § 2255, it is still the same question and must again be answered the same way. Accordingly, there is no basis for reconsideration of these facts, thoroughly addressed by the Government's 1989 Brief to the Circuit and

---

1. [Footnote by the Court]: It was *seven* weeks, *see supra,* and the subject of substantial inquiry.

the subsequent rejection of this claim by the Court of Appeals.

Accordingly, Clark's present motion to vacate or set aside his conviction under 28 U.S.C. § 2255, is denied. There is no need for a hearing.

The foregoing is so ordered.

## APPENDIX A

88–1493

*To be argued by*

ROBERT HAMMEL

United States Court of Appeals

FOR THE SECOND CIRCUIT

Docket Nos. 88–1493, 88–1494, 88–1500, 88–1501, 89–1226

UNITED STATES OF AMERICA, *Appellee*,

v.

MARK REITER, RAYMOND CLARK, a/k/a "Romar," LEONARD ROLLACK, a/k/a "Petey," a/k/a "Peter Rollack," a/k/a "Peter, Ifill," ALFRED DICKS, and TIMOTHY SMITH, a/k/a "Heartbeat," *Defendants*,

MARK REITER, RAYMOND CLARK, LEONARD ROLLACK, ALFRED DICKS and TIMOTHY SMITH, *Defendants–Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

### BRIEF FOR THE UNITED STATES OF AMERICA

BENITO ROMANO,

*United States Attorney for the Southern District of New York, Attorney for the United States of America.*

ROBERT HAMMEL,

MARLA T. GALENO,

ROBERT W. RAY,

ANDREW E. TOMBACK,

KERRI MARTIN BARTLETT,

*Assistant United States Attorneys, Of Counsel.*

## B. Clark Was Not Improperly Denied Access to Exculpatory Evidence.

Clark claims that he was entitled to a new trial because the Government belatedly produced two reports containing allegedly exculpatory information about his involvement in several charged murders. He further claims that at trial the District Court erred in excluding those reports and the testimony of the law enforcement officers who prepared them. Clark's claims are frivolous because Clark had ample time to investigate the contents of the reports and because all of the proffered evidence was properly excluded as hearsay.

### 1. The Relevant Facts

The Government offered evidence at trial that it was Clark who actually shot and killed Beverly Ash, Steven Ash, and Norman Bannister. Pursuant to a request from Clark's counsel, some time just prior to July 8, 1988, and during the Government's direct case, the Government provided to him certain New York City Police Department reports from the homicide files of those three victims. (Tr. 5176, 5780). Two such reports were Complaint Follow–Up Informational Reports, Forms DD–5, one authored by Detective Edwin Cruz, from the 34th Precinct Detective Unit ("Cruz report") (GX 1001), and the other authored by Detective R. Finelli, from the 5th Precinct Detective Unit ("Finelli report") (GX 1001), respectively. (Tr. 7968). The Government had inadvertently failed to turn those reports over to Clark prior to trial, notwithstanding the existence of material in those reports indicating that Reiter, rather than Clark, had

actually committed the murders of Steven and Beverly Ash.

The Cruz report provided, in pertinent part, as follows:

SUBJECT: CASE CLOSED, EXCEPTIONAL CLEARANCE

1. Information received from U.S. Attorney Benito Romano is that Mark Retter [sic] shot and killed Beverly Ash. This information was obtained from a reliable, high echelon confidential informant that is working for the FBI. The reason for the execution was that Beverly Ash was responsible for the arrest of several organized crime family members, who were indicted for conspiracy to distribute heroin.

Likewise, the Finelli report, after describing the three murders, stated, in pertinent part, as follows:

6. The following information received from Special Agent Stan Morrissey of the Drug Enforcement Administration:

He has a Confidential Informant who is a major narcotics violator and who has successfully testified in numerous Federal cases. This informant states that Steven Ash, Beverly Ash and Barry Wilson were murdered by the same perpetrator, Mark Reiter. Steven was killed by Mark as a warning to Nicky Barnes to keep his mouth shut. He was shot behind the Yankee Stadium in the Bronx and dumped into the river. Agent Morrissey further advised that the informant is a reliable and high level member of an organized crime family but he cannot be interviewed, identified nor allowed to testify because of a serious risk to the informant's life and his value to future investigations. This person is in

the Federal Witness Protection Program.

On July 8, 1988, after reviewing the Cruz and Finelli reports, Clark moved for a mistrial and a severance, arguing that "he should have had that material which was exculpatory before the trial began." (Tr. 5177). Defense counsel for Clark provided the material to the District Court for review, and Judge Owen directed the Government to respond to the severance and mistrial motions on the following Monday. (Tr. 5781, 5316–22).

On Monday, July 11, 1988, the Government argued that no mistrial was necessary because the informant referred to in the reports* may have been Nicky Barnes, who had already testified for the Government and who was available for recall by the defense. Thus, the Government argued, the defense would have suffered no prejudice from the Government's delayed disclosure of the reports. (Tr. 5392–94). The District Court then directed the Government to conduct an inquiry to identify the informant referenced in the Cruz and Finelli reports. (Tr. 5399). The trial judge further stated that a hearing would be conducted on the identity of the informant, if appropriate. (Tr. 5399).

On July 25, 1988, Government counsel advised the District Court of the status of the investigation. (Tr. 6611). AUSA Galeno stated she had had a conversation with then former AUSA Benito Romano, who was specifically mentioned in the Cruz report. *Id.* Romano advised her that although Barnes had provided information concerning the Ash homicides, "Barnes had never stated that Reiter was the shooter." *Id.* Romano further advised her that, through certain DEA agents, Roma-

---

* Close review of the reports suggests that the informant referred to in each report is the same person.

no had learned that the FBI had an informant who had provided information concerning Mark Reiter. *Id.* Romano did not know the identity of the informant, nor did he remember whether he had communicated any information concerning the existence of that informant to a New York City detective. *Id.* Romano further did not remember whether the FBI informant had provided information about Reiter's involvement in homicides. (Tr. 7975). Romano referred AUSA Galeno to DEA Special Agent Stanley Morrissey, who was specifically mentioned in the Finelli report. (Tr. 6611–12). AUSA Galeno spoke to Agent Morrissey, who confirmed that the FBI had communicated with an informant concerning Mark Reiter. (Tr. 6612). Morrissey did not know the identity of the informant; nor did he know whether the informant had ever provided any information concerning Reiter's involvement in homicides. *Id.* Morrissey referred AUSA Galeno to FBI Special Agent Bruce Maw. *Id.*

AUSA Galeno reported that Bruce Maw identified Bill Battista and Willie Boy Johnson as the two informants used by the FBI in the investigation of Mark Reiter. *Id.* Maw advised AUSA Galeno that the identities of the two informants were disclosed during the trial against organized crime figure John Gotti in the Eastern District of New York and that their informant files, which would reveal any information that they had provided, had been made public. (Tr. 6612–13). Maw thus directed AUSA Galeno to consult AUSA John Gleason, in the Eastern District of New York, one of the prosecutors in the Gotti trial, in order to obtain the informant files. (Tr. 6613).

AUSA Galeno later advised the District Court:

The current state of the record is Mr. Gleason is doing a search for his informant files on Bill Battista and Willie Boy Johnson. He is not sure whether or not Bill Battista ever implicated Reiter in the homicides. The ultimate issue we are after, there is still some uncertainty as to that but we should have a better idea after we are able to review these files.

He referred me also to a Special Agent Pat Colgan at the FBI, who was the FBI agent in charge of the Reiter case in 1983, and Agent Colgan may have the files if Mr. Gleason's files are incomplete.

*Id.* AUSA Galeno also reported that Agent Maw advised her that Bill Battista, displeased with the disclosure of his identity during the Gotti trial, had absconded, and his whereabouts were then unknown. (Tr. 6613–14).

On August 2, 1988, the District Court held a hearing in a final attempt to ascertain the identity of the informant referenced in the reports. (Tr. 7952–93). At the hearing Detective Cruz testified that he was a New York City homicide investigator assigned to assist in the investigation of the homicide of Beverly Ash in December 1982. (Tr. 7952–53). Cruz testified that he had met with then AUSA Benito Romano on May 2, 1983, and that Romano had told him that a high-level FBI informant had provided information implicating Mark Reiter in the Beverly Ash homicide. (Tr. 7957, 7968). Cruz recollected that Romano had told him that Mark Reiter "shot and killed" Beverly Ash. (Tr. 7968). Cruz further stated that he was never told the identity of the informant, nor did he have an opportunity to interview either the informant or the FBI agents who had interviewed the informant. (Tr. 7968–69). Cruz also explained that because the informant could not be interviewed, the prosecution could not proceed and, as a result, the case was closed with "exceptional

clearance," pending any new developments. (Tr. 7971).

FBI Special Agent Patrick F. Colgan, Jr. testified that he was the supervising agent for Government informant Bill Battista. (Tr. 7976). Colgan explained that, as supervising agent, he was the only person who had direct contact with Battista. (Tr. 7976). Colgan testified, based on his recollection of debriefings of Battista and after having reviewed an approximately 300–page informant file, that Battista had never provided any information concerning Mark Reiter's involvement in any homicides. (Tr. 7977–78). Finally, Colgan reviewed the Cruz report and testified that based on his debriefings of Battista, he did not believe Battista to be the informant referred to in the report. (Tr. 7980–81).

Special Agent James Roth, general counsel for the FBI in New York, testified that at the request of AUSA Galeno he had reviewed two files of informants who had provided information about Mark Reiter. (Tr. 7983–85). Roth testified that based on his review of the informant files of Willie Boy Johnson, whose sponsoring agent was Agent Abbott, and an undisclosed deceased informant, whose sponsoring agent was Special Agent Paul Hayes, neither informant provided any information linking Mark Reiter to a homicide. (Tr. 7983–85). Indeed, Reiter's name was not mentioned in the undisclosed informant's file. (Tr. 7985). .

During the hearing, government counsel proffered that she had had a conversation with FBI Special Agent Don McCormack, who supervised the only other informant that she had been able to identify who had provided information about Mark Reiter. (Tr. 7982, 7987). AUSA Galeno stated that McCormack advised her that "his in-

formant never provided any information linking Reiter to any homicide." (Tr. 7987). AUSA Galeno nonetheless agreed to have McCormack produced at the defense's request. (Tr. 7987). In response to the District Court's inquiry about whether Romano, then a private citizen, should be produced, Clark's counsel advised that he had spoken to Romano and did not intend to call him. (Tr. 7987). Defense counsel stated that Romano, who did not know the identity of the informant, had advised that the informant referred to was "definitely not Nicky Barnes," and that he had "no knowledge concerning who may or may not have shot Beverly Ash." (Tr. 7987, 7988).*

At the conclusion of the hearing, the District Court denied the motion for a mistrial, finding that all possible investigative steps to ascertain the identity of the informant had been taken. (Tr. 7989). The trial court then concluded:

THE COURT: The problem is I think you have to be realistic here. There may be in the world somebody who said that. That person may very well have been the recipient of the hearsay from somebody else and we all remember the famous story in law school about how if you take somebody who tells a story to one person in a room and it is repeated to half a dozen people, the thing that comes out of the half dozenth is vastly different than what goes into the first one.

So if the informant has the information, that may or may not be accurate, but, frankly, it is not that far off the mark if you credit what we have heard here which was that Reiter ordered the killing because the difference between ordering it and doing it is legally insig-

---

* The Government also made Detective Finelli available to Clark's counsel, who never stated on the record whether he had ever spoken with the Detective. (Tr. 7991–92).

nificant and as a factual matter it might have been garbled in translation by somebody but the informant might have very well said that Mark Reiter ordered the killing.

I can see it happening that way. (Tr. 7990).

On August 5, 1988, Clark's counsel asked the District Court to permit him "to call Detective Cruz and Detective Finelli to present evidence before the jury concerning the police reports or in the alternative to at least submit the police reports to the jury for their consideration inasmuch as they indicate someone other than Mr. Clark is responsible for the homicide in this case." (Tr. 8413). In support of his application, defense counsel argued:

I urge upon you in arguing that they ought to be able to be heard, I refer you to Rule 801, the declarants being Detectives Cruz and Finelli who would be available and be subject to cross-examination. I believe that the information contained in those reports as an admission of a party opponent in that it reveals, the government being the party, your Honor, and Finelli and Cruz being agents of the government, I think their report should be regarded by you as admission of a party opponent because, obviously, if they have represented, the government, that Mr. Clark is responsible for a homicide, then previous reports, it has been revealed, that he is not the perpetrator of the homicides in question.

So under Rules 801, 803 and 804, I would respectfully suggest that you ought to permit me to call those detectives to reveal to the jury that someone other than Mr. Clark was identified as the perpetrator of the Ash murders. In the alternative they should read the reports in question.

\* \* \* \* \* \*

Finally, I am arguing to you they were statements made by agents of the government and they were made in a representative capacity.

Obviously, as Mr. Clark has requested I urge upon you, the reports were not made by him, they were made by representatives of the government in their capacity as agents and within the scope of their employment and obviously they were made within the scope of their employment during the existence of their relationship with the government and for that reason they should be permitted in.

(Tr. 8413–15). The Government objected to the admission of the reports and to the defense's attempt to call Finelli and Cruz as witnesses. Having examined the reports and heard the testimony of the witnesses and the arguments of counsel, the District Court excluded the evidence. (Tr. 8415).

**2. Discussion**

Clark's claims for relief, based on the Government's production during trial of the reports and based on the District Court's exclusion of testimonial and documentary hearsay, are both meritless.

**a) Document Production**

■ Clark's reliance on *Brady v. Maryland, supra,* to support his specific claim that he was entitled to the documents *prior* to trial is misplaced.\* Clark ignores the simple fact that "[n]either *Brady* nor any other case ... requires that disclosure under *Brady* must be made before trial."

---

\* Clark does not claim, nor can he, that the Government intentionally withheld exculpatory material. When the Government learned that Clark had served a subpoena on the police department for certain materials which were not forthcoming, the Government, as Clark concedes, "was kind enough to turn over the material that they had." (Tr. 5176). The Government's failure to disclose the reports earlier was due to sheer inadvertence. *See United States v. Miranda,* 526 F.2d 1319, 1324–25 (2d Cir.1975) (where even *total failure* to disclose evidence is merely inadvertent, new trial required only if there is a significant

*United States ex rel. Lucas v. Regan*, 503 F.2d 1, 3 n. 1 (2d Cir.1974), *cert. denied*, 420 U.S. 939, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975); *see also Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); *United States v. Evanchik*, 413 F.2d 950, 953 (2d Cir.1969). The Government's *Brady* obligation is satisfied where, as here, the defense receives the information in time to make use of it. *United States v. Boschetti*, 794 F.2d 416, 418 (8th Cir.) (where thirty-six tape recordings were disclosed the day before trial began, and three tapes contained exculpatory material, no grounds for reversal where material "was discovered in time to be of use in the trial process"), *cert. denied*, 479 U.S. 889, 107 S.Ct. 289, 93 L.Ed.2d 263 (1986). *See also United States v. Mourad*, 729 F.2d 195, 199 (2d Cir.), *cert. denied*, 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984) (where production of discovery material is delayed, not suppressed, and there is no showing of abuse or that delay resulted in prejudice, there are no grounds for reversal).

■ Although clearly the reports here should have been produced earlier, and would have been but for inadvertence, the documents were produced while the Government's case-in-chief was still underway; further, the Government engaged in enormous investigative efforts to discover the identity of the informant for use in Clark's defense. Clark failed to suggest to the District Court (Tr. 7989), nor does he suggest here, any additional investigative steps he would or could have taken had the reports been disclosed earlier, nor did he request an adjournment at the time to pursue any further leads. Thus, Clark cannot demonstrate that he was in any way prejudiced by having received the documents during trial, rather than before trial. The unfortunate fact for Clark is that the informant, if he existed, could not be identified; however, there is simply no chance that the informant would have been identified if the reports had been disclosed earlier. Accordingly, Clark's claim for a new trial based on the Government's production of exculpatory material during the trial, rather than before trial, must fail.

### b) Exclusion of Testimonial and Documentary Hearsay

Clark's plea for a new trial based on the District Court's exclusion of what amounted to rank hearsay also rings hollow. As Judge Owen properly found, both the testimony of the law enforcement officers and the reports themselves constituted "hearsay with a capital H." (Tr. 7990). Thus, they were properly excluded.

■ Clark's reliance on Fed.R.Evid. 801(d)(2)(A) and 801(d)(2)(D) * grossly misses the mark. Clark sought to offer, either through the police officers or through the reports themselves, the statements of an alleged *informant* that Reiter was responsible for the Beverly and Steven Ash homicides and that Steven Ash was shot behind Yankee Stadium. Those statements were clearly not the statements

---

chance that undisclosed evidence would have changed the result), *cert. denied*, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976). As we argue herein, in light of the evidence adduced at the hearing, it is overwhelmingly evident that earlier production of the materials would not have changed the result of the trial.

* Federal Rule of Evidence 801(D)(2) provides that "A statement is not hearsay if:"

(2) *Admission by party-opponent.* The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity or ... (D) a statement by the party's agent ... concerning a matter within the scope of the agency ... made during the existence of the relationship.

of the Government in "an individual or representative" capacity or indeed in any capacity. *Cf. United States v. Santos*, 372 F.2d 177, 180 (2d Cir.1967) (holding that statements by federal agents are not admissible against the Government "as evidentiary proof of the matter therein stated"). Nor is Fed.R.Evid. 801(d)(2)(D) available to a defendant who seeks to admit against the Government the statements of an informant. *See* D. Louisell & C. Mueller, *Federal Evidence* § 426 at 330 (1980) ("informant ought not to be viewed as an 'agent' of the government within the meaning of Rule 801(d)(2)(D)").

Similarly, Clark's blanket reliance on "Rules 801, 803, and 804" is inadequate. Clark cannot claim that Judge Owen committed reversible error in failing to admit the proffered evidence under some hearsay exception which Clark failed to articulate. *See United States v. DiMaria, supra,* 727 F.2d at 270 n. 4; *United States v. Grammatikos, supra,* 633 F.2d at 1022; *United States v. Pugliese, supra,* 712 F.2d at 1580; *United States v. Pinto, supra,* 633 F.2d at 1022; *United States v. Carson, supra,* 464 F.2d at 424.

Finally, even had Clark attempted to offer the police reports under either Fed.R.Evid. 803(6) as a business record, Fed.R.Evid. 803(8) as a public record, or Fed.R.Evid. 803(24) or 804(b)(5), which provide generally for admission of documents not covered by other exceptions, "but having equivalent circumstantial guarantees of trustworthiness," *United States v. Bortnovsky,* 879 F.2d 30, 34 (2d Cir.1989), those sections would have been unavailing. The statements of the informant within the police reports were not part of a business record because the de-

clarant had no "duty to report the information he was quoted as having given." *Id.* at 34 (citing cases). Moreover, the admission of the informant's statements within the exception for reports of public agencies or the catch-all exceptions depends upon the trustworthiness of the statements— which is clearly lacking here. *Id.* at 35. Here, where the authors of the documents never met or interviewed the informant; the informant's identity could not be ascertained after thorough investigation; the statements that were reported, which may not have been based on personal knowledge, were communicated to the authors of the documents from an informant via at least an FBI agent and an AUSA; the statements were not sufficiently reliable.* *Id.* (district court properly excluded an insurance adjuster's report containing the statement of the employee of a merchant that certain goods were delivered at a certain time to the insured, where there was no evidence that the declarant "would have had personal knowledge of the date on which the coats were delivered"); *United States v. Durrani,* 835 F.2d 410, 425 (2d Cir.1987) (quoting *City of New York v. Pullman, Inc.,* 662 F.2d 910, 914 (2d Cir. 1981)) (trial judge has "wide discretion" in determining "whether the hearsay document offered in evidence has sufficient independent indicia of reliability to justify its admission"), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982). Accordingly, the District Court did not abuse its broad discretion in declining to admit the police officer's testimony and the reports.

---

* The District Court aptly noted that based on the evidence that Reiter ordered the Beverly and Steven Ash homicides, it was not unreasonable to find that the statement that Reiter "shot and killed" Ash was, on its face, simply "garbled in translation." (Tr. 7990).